**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **Case No. 2:10-cv-336** |
| **v.** | **Judge Peter C. Economus** |
| | **Magistrate Judge Norah McCann King** |
| **TOBIAS H. ELSASS, et al.,** | **MEMORANDUM OPINION AND ORDER** |
| **Defendants.** | |

Presently pending before the Court are the Parties' cross-motions for summary judgment (Docs. 212 & 230) and the Defendants' Motion to Strike Certain Government Summary Judgment Exhibits (Doc. 236).  For the reasons that follow, the Court will **DISMISS** without deciding the motion to strike, and **GRANT in PART** and **DENY in PART** the cross motions for summary judgment.  Further, the Court **GRANTS** injunctive relief to the Government as specified in the Judgment and Permanent Injunction filed concurrently with this opinion and order.

## I.

Plaintiff, the United States of America, brings the instant civil action against Defendants Tobias H. Elsass ("Elsass"), Fraud Recovery Group, Inc. ("FRG"), and Sensible Tax Services, Inc. ("STS") seeking to enjoin the Defendants from providing certain services to taxpayers on the grounds that the Defendants have frequently engaged in practices that violate the tax laws.

FRG and STS are entities founded and controlled by Elsass.  Collectively, the Defendants are in the business of helping taxpayers claim tax refunds through tax deductions for theft losses made allowable by § 165 of the Internal Revenue Code ("I.R.C."), 26 U.S.C. § 165.  The Defendants' business focuses on purported theft losses arising from investment scams such as

the one famously orchestrated by Bernie Madoff.  Their business model consists of researching and identifying investment scams that might give rise to § 165 theft-loss deductions, marketing their services to the victims of such scams, and assisting the victims in filing amended tax returns to obtain a tax refund based on the loss sustained through the scam.  In exchange for these services, the Defendants are compensated by a percentage of the refund obtained.

In bringing this action, the Government contends that the Defendants have frequently engaged in practices that run afoul of the I.R.C. and the rules and regulations governing the United States' income tax scheme promulgated by the Treasury Department and the Internal Revenue Service ("IRS").  Among other allegations, the Government contends that the Defendants frequently and willfully have attempted to obtain theft-loss deductions for their customers in instances where doing so is improper or altogether groundless.  To prevent the Defendants from continuing to operate in ways that it contends blatantly run afoul of the tax laws, the Government seeks to permanently enjoin the Defendants pursuant to §§ 7402, 7407, and 7408 of the I.R.C. from engaging in the business of assisting taxpayers with § 165 theft-loss deductions.

After conferring with the Parties as the case approached trial, the Court determined that the action could likely be resolved through cross-motions for summary judgment.  (*See* Doc. 208.)  The Parties have accordingly moved for summary judgment and briefing on the issues is now complete.

## II.

Before discussing the Parties' motions for summary judgment, the Court first considers the Defendants' pending motion to strike Government Exhibits 77, 156, 157, 191, 286, 340, 341, 342, 353, 456, 458, 459, 479, 482, 483, 498, 501, 502, 503, and 504.  (Doc. 236.)  Defendants

argue that the Court should not consider these documents on various grounds.  However, as the Court has not relied upon any of the identified exhibits in deciding the pending summary judgment motions nor in determining the appropriate relief to the Government, it is unnecessary for the Court to decide the legal merits of the Defendants' motion to strike.  Accordingly, the Defendants' Motion to Strike Certain Government Summary Judgment Exhibits (Doc. 236) is dismissed.

### III.

### A.

The Court now turns to the cross-motions for summary judgment.  Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting prior version of FED. R. CIV. P. 56).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.* at 323–25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation and citation omitted).

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party."  *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v.*

*Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

**B.**

Prior to discussing the injunctive relief sought by the Government, the Court will first give a very brief overview of the Defendants and their business model.  As explained below, the Court will also briefly dispose of the majority of the Government's claims as they pertain to the conduct of STS.

Elsass was an attorney admitted to practice law in Ohio in 1980.  (Elsass Dep. 14, Gov. Ex. 486, Doc. 226, PAGEID # 7486.)[1]  He ceased practicing law after his law license was suspended in 1998.  (*Id.* at 16, Doc. 226, PAGEID # 7488.)  Prior to forming FRG, he worked as a salesman for a business known as JK Harris, "selling" § 165 theft loss deductions to victims of financial scams.  (*See id.* at 39, Doc. 226, PAGEID # 7496.)  After his employment with JK Harris ended in December 2005, he founded FRG the following January.  (*Id.* at 170, Doc. 226-2, PAGEID # 7555.)  Elsass initially operated FRG out of his home, but toward the end of 2008, he moved the business to its present location of 965 High Street in Worthington, Ohio.  (United States' Statement of Contested and Uncontested Facts, ¶ 11, Doc. 229-1, PAGEID ## 8192–93.)

Elsass is the President and Chief Executive Officer of FRG.  (Elsass Dep. 199, Gov. Ex. 486, Doc. 226-3, PAGEID # 7564.)  He is the company's only officer and only shareholder.

---

[1] For ease of reference, the Court will cite documents in the record using the identification numbers assigned by the Court's electronic docketing system in addition to the specific exhibit numbers.

(*Id.*)  FRG charges contingent fees for its services.  Under the company's initial fee structure, customers had two options; either they could make an advance cash payment, calculated as a percentage of the estimated tax refund, or the fee could be deferred and taken by FRG as a percentage of the actual refund received.  (*See id.* at 254–55, Doc. 226-4, PAGEID ## 7584–85.)  The current fee structure is similar, with prepay customers paying 15% of the expected return and deferred customers paying what Elsass terms a blended fee—7.5% cash in advance and 20% of the final refund.  (*Id.* at 637, Doc. 227-7, PAGEID # 7827.)  According to Elsass, a large portion of FRG's customers are elderly.  (*Id.* at 76, Doc. 226, PAGEID # 7507.)

STS is owned by FRG and was created in 2009 so that customer tax returns could be prepared in-house.  (*Id.* at 71, PAGEID # 7506.)  The Defendants represent that STS is still an active Ohio corporation, but that there is no present intention for it to again become actively involved in the theft-loss deduction business.  (Defs.' Mem. Opp'n 1 n.1, Doc. 235, PAGEID # 8685.)  Upon reviewing the extensive record produced by the Government, the Court concludes that the Government has failed to offer evidence linking STS directly to the enjoinable conduct of the other Defendants analyzed herein, with the exception of aiding and abetting the understatement of tax liability in violation of I.R.C. § 6701, as discussed in Part III.B.2.b, *infra*.  However, given that STS is owned solely by Elsass through his ownership of FRG, the Court's conclusion in this regard has no impact on the ultimate relief to the Government awarded concurrently with this decision.  Nonetheless, the Court grants the Defendants' motion for summary judgment as to the claims against STS with the exception of the violations of § 6701.

## 1.

Section 7407 of the I.R.C. vests the Court with authority to enjoin "tax return preparers" from engaging in certain conduct specified in that section.  Further, if the Court determines that a

person acting as a tax return preparer has "continually or repeatedly engaged in [the specified prohibited conduct] and that an injunction prohibiting such conduct would not be sufficient to prevent such person's interference with the proper administration of [the I.R.C.]," it may enjoin the person from acting as a tax return preparer.  26 U.S.C. § 7407(b).

Here, the Government argues that the Defendants are tax return preparers as that term is defined by statute and that they have repeatedly engaged in a myriad of conduct made enjoinable pursuant to § 7407.  Specifically, the Government contends that the record establishes (1) Elsass and FRG have violated 26 U.S.C. § 6694 (made enjoinable by § 7407(b)(1)(A)); (2) Elsass and FRG have violated 26 U.S.C. § 6695(f) (§ 7407(b)(1)(A)); (3) Elsass has misrepresented his eligibility to practice before the IRS (§ 7407(b)(1)(B)); and (4) Elsass and FRG have otherwise engaged in "fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue laws" (§ 7407(b)(1)(D)).  Because it asserts that Elsass and FRG have repeatedly engaged in the prohibited conduct and that an injunction of specific conduct would not suffice to prevent their interference with the proper administration of the tax laws, the Government seeks an injunction preventing the Defendants from serving as tax return preparers.

**a.**

As the Court's authority under § 7407 applies only to tax return preparers, the Court must first determine whether there is no dispute of material fact as to whether the Defendants meet the definition of that term.  "Tax return preparer" is defined by the I.R.C. to mean:

> any person who prepares for compensation, or who employs one or more persons to prepare for compensation, any return of tax imposed by this title or any claim for refund of tax imposed by this title. For purposes of the preceding sentence, the preparation of a substantial portion of a return or claim for refund shall be treated as if it were the preparation of such return or claim for refund.

6

26 U.S.C. § 7701(a)(36)(A).  The term "person" is defined broadly by the I.R.C. to include

individuals, partnerships, companies, and corporations.  *See id.* § 7701(a)(1).  According to the

Seventh Circuit, one purpose of the broad definition of tax return preparer

> was to ensure that the person who makes the decisions and calculations involved
> in preparing a particular return will be considered the preparer of that return, even
> if that person "does not actually place the figures on the lines of the taxpayer's
> final tax return."  H.R. Rep. No. 658, 94th Cong., 2d Sess. 275, reprinted in 1976
> U.S.C.C.A.N. 3171.  Thus, furnishing of advice can make one a preparer, while
> mechanical assistance in preparing the return does not.

*Goulding v. United States*, 957 F.2d 1420, 1424–25 (7th Cir. 1992).

Here, the Government has demonstrated that there are no genuine factual disputes as to

whether the Defendants are tax return preparers.  As an initial matter, it is undisputed that the

Defendants receive compensation for their services in the form of a percentage of any tax refund

received by their customers.  Further, STS was undoubtedly a tax return preparer as the record

reflects that it exists primarily for the purpose of completing amended tax returns for customers

of FRG claiming § 165 theft loss deductions.  (Elsass Dep. 71; Doc. 226, PAGEID # 7506.)  STS

also provided general preparation services to taxpayers outside the § 165 theft-loss deduction

context.  (*See* Gov. Ex. 293 at 1, Doc. 219-31, PAGEID # 6267; Gov. Ex. 308 at 1, Doc. 220-4,

PAGEID # 6328 ("[STS] is in the business of preparing current year tax returns.").)

Regarding Elsass and FRG, the Government has directed the Court's attention to some

twenty-eight tax returns either signed by Elsass himself (in some cases on behalf of FRG), or

listing FRG or STS as the firm employing the signer.  (*See* Gov. Ex. 12, Doc. 212-13; Gov. Ex.

17, Doc. 212-18; Gov. Ex. 18, Doc. 212-19; Gov. Ex. 20, Doc. 212-21; Gov. Ex. 23, Doc. 212-

24; Gov. Ex. 27, Doc. 213-1; Gov. Ex. 34, Doc. 213-8; Gov. Ex. 36, Doc. 213-10; Gov. Ex. 46,

Doc. 213-20; Gov. Ex. 48, Doc. 213-22; Gov. Ex. 49, Doc. 213-23; Gov. Ex. 50, Doc. 213-24;

Gov. Ex. 75, Doc. 214-6; Gov. Ex. 121, Doc. 215-10; Gov. Ex. 124, Doc. 215-13; Gov. Ex. 126,

Doc. 215-15; Gov. Ex. 148, Doc. 215-37; Gov. Ex. 151, Doc. 216; Gov. Ex. 153, Doc. 216-2;

Gov. Ex. 175, Doc. 216-27; Gov. Ex. 183, Doc. 216-35; Gov. Ex. 303, Doc. 219-40; Gov. Ex.

316, Doc. 220-12; Gov. Ex. 430, Doc. 224-21; Gov. Ex. 432, Doc. 224-23; Gov. Ex. 448, Doc.

224-36; Gov. Ex. 469, Doc. 225-21; Gov. Ex. 499, Doc. 228-12.)  In addition to the individual

returns included in the record, the Government has also submitted a chart indicating that it has

identified 91 total returns listing either FRG or STS as the firm of the paid preparer and 112 total

customers of Defendants whose returns were signed by Elsass personally. (*See* Gov. Ex. 457A,

Doc. 225-1.)  The Defendants have not attempted to dispute the Government's contentions

regarding these returns.

      While the signed tax returns may not be entirely dispositive of the issue, the record also

establishes that Elsass and FRG were the moving force behind the decisions and calculations

regarding the returns.  For instance, the record contains various memoranda from Elsass/FRG

that provide instructions for how amended returns should be completed.  (*See* Gov. Ex. 13, Doc.

212-14,; Gov. Ex. 26, Doc. 213; Gov. Ex. 31, Doc. 213-5; Gov. Ex. 33, Doc. 213-7; Gov. Ex. 35,

Doc. 213-9; Gov. Ex. 39, Doc. 213-13; Gov. Ex. 41, Doc. 213-15; Gov. Ex. 45, Doc. 213-19;

Gov. Ex. 47, Doc. 213-21; Gov. Ex. 53, Doc. 213-27; Gov. Ex. 58, Doc. 213-32; Gov. Ex. 119,

Doc. 215-8; Gov. Ex. 123, Doc. 215-12; Gov. Ex. 185, Doc. 216-37; Gov. Ex. 187, Doc. 216-39;

Gov. Ex 190, Doc. 217-1; Gov. Ex. 195, Doc. 217-6; Gov. Ex. 304, Doc. 220; Gov. Ex. 367,

Doc. 223; Gov. Ex. 417, Doc. 224-9; Gov. Ex. 422, Doc. 224-14; Gov. Ex 445, Doc. 224-34;

Gov. Ex. 457B, Doc. 225-2; Gov. Ex. 476, Doc. 225-28.)  These forms are labeled

"INSTRUCTIONS FOR PREPARATION OF AMENDED RETURNS" and typically provide

the name of the scam involved, the amount lost by the taxpayer, and the year of discovery,

which, as explained *infra*, is important for the proper analysis of a § 165 theft-loss claim.

Further, FRG's website stated that one of the services provided to customers was "[a]ssistance in preparation and submission of all necessary forms and supporting documentation."  (Gov. Ex. 307 at 3, Doc. 220-3, PAGEID # 6318.)

According to Gwynn Kinsel, an attorney employed by FRG between November 2008 and December 2009,

> [Elsass] … directed how theft loss claims should be reported on the amended returns prepared for [FRG] customers…. [A]though [FRG] itself did not physically fill out the amended tax return forms for its customers, Mr. Elsass oversaw the actions of both the individuals employed by [STS] as well as outside tax preparers, issuing instructions for the tax preparers telling the preparer exactly how to prepare the return and asking for corrections if a return was not prepared to his satisfaction.

(Kinsel Decl. ¶ 9, Gov. Ex. 492, Doc. 228-5, PAGEID # 8099.)

While the Defendants assert that the in-house preparation of the actual amended tax returns by STS has now stopped and is outsourced to other entities, the record also reflects that Elsass himself is still involved in reviewing completed forms.  (*See* Elsass Dep. 583, Gov. Ex. 486, Doc. 227-5, PAGEID # 7783 (Elsass describing request from employee on the day of his deposition that he review a return).)  Further, the Court notes that the statutory definition of tax return preparer is broadly written to include those who "employ" others to prepare tax returns. Elsass and FRG accordingly can be considered tax return preparers by virtue of the fact that they currently hire entities to complete amended tax returns for FRG's customers for a fee.  Aside from the actual direction as to how tax forms should be completed and the retention of others to process forms, the Court also looks to the "upfront" research work done by FRG and Elsass identifying scams that may qualify for theft-loss treatment.  (*See* Defs.' Mem. Supp. Mot. Summ. J. 6–7, Doc. 230, PAGEID ## 8243–44.)  As the information gathered through that research is ultimately used in supporting the customers' individual theft-loss deductions, the Court considers

this a significant factor in concluding that FRG and Elsass are tax return preparers.

Finally, the generation of revenue through tax refunds obtained via amended tax returns is the sine qua non of FRG's business. While the Defendants claim that all of the actual tax preparation is now performed by independent tax professionals, and that FRG accordingly is only a firm that markets the services of these professionals as opposed to being a tax return preparer, the fee structure belies this contention. As noted by the Seventh Circuit in *Goulding*, Congress intended the definition of tax return preparer to encompass those contributing to the material decisions regarding tax returns. As such, to consider FRG and Elsass to be outside that definition based on structural technicalities would be contrary to the will of Congress.

The Defendants do little to contest the factual record cited by the Government tending to establish that they are tax return preparers within the meaning of § 7407, but instead rely on Judge Boasberg's recent decision in *Loving v. I.R.S.*, 917 F. Supp. 2d 67 (D. D.C. 2013) to argue that they are not tax return preparers. *Loving* dealt with the Secretary of the Treasury's authority to regulate tax return preparers involved only in preparing, signing, and submitting tax returns to the IRS under the authority granted by 31 U.S.C. § 330, which authorizes the Secretary to regulate "the practice of representatives of persons before the Department of the Treasury." 31 U.S.C. § 330(a).

Judge Boasberg ultimately concluded that § 330 could not be interpreted to include those who merely prepare and file tax returns. In doing so, he noted that while the phrase "practice of representatives" is not defined, the phrase "advise and assist persons in presenting their cases" found in subsection 330(a)(2)(D) strongly suggested that Congress intended the term "representatives" to be limited only to those who assist taxpayers during audits and appeals. *See Loving*, 917 F. Supp. 2d at 74. According to Judge Boasberg, "[f]iling a tax return would never,

in normal usage, be described as 'presenting a case.'" *Id.*

Contrary to the Defendants' argument that *Loving* somehow stands for the proposition that they are not subject to injunction pursuant to § 7407, a careful reading of Judge Boasberg's decision actually supports the Court's conclusion that they are tax return preparers.  In this regard, Judge Boasberg also looked to the broader statutory scheme when he determined that an expansive interpretation of 31 U.S.C. § 330 would contravene the will of Congress, summarizing his analysis as follows:

> Two aspects of § 330's statutory context prove especially important here. Both relate to § 330(b), which allows the IRS to penalize and disbar practicing representatives. First, statutes scattered across Title 26 of the U.S. Code create a careful, regimented schedule of penalties for misdeeds by tax-return preparers. If the IRS had open-ended discretion under § 330(b) to impose a range of monetary penalties on tax-return preparers for almost any conduct the IRS chooses to regulate, those Title 26 statutes would be eclipsed. Second, if the IRS could "disbar" misbehaving tax-return preparers under § 330(b), a federal statute meant to address precisely those malefactors—26 U.S.C. § 7407—would lose all relevance.

*Id.* at 75–76.  In other words, the category of tax professionals who challenged the IRS' regulations of their activity issued pursuant to 31 U.S.C. § 330 in *Loving*, are covered by § 7407.

In sum, FRG and Elsass are compensated for guiding taxpayers through the process of amending previous years' tax returns in order to obtain a tax refund arising from a § 165 theft loss.  The generation of revenue through the filing of the amended returns is the very essence of FRG's business, and is accomplished in part using information about the various scams researched by Elsass and FRG.  At various times, Elsass and FRG's employees actually completed and signed tax return forms.  At other times, the forms were completed by third parties per Elsass/FRG's instructions.  At still others, third parties were employed by FRG to complete the forms. For these reasons, the Defendants are tax return preparers as that term is defined by § 7701 of the I.R.C. and are thus subject to the Court's injunctive authority under §

11

7407.

**b.**

The Government requests the Court to permanently enjoin the Defendants from acting as tax return preparers pursuant to § 7407 on the grounds that the Defendants have continually or repeatedly engaged in several forms of conduct specified in that section. The Court will now consider the alleged conduct.

**i.**

Section 7407 makes enjoinable "any conduct subject to penalty under [I.R.C.] section 6694." 26 U.S.C. § 7407(b)(1)(A). Section 6694 establishes two penalties for the understatement of tax liability by tax return preparers. First, a tax return preparer may be penalized for an understatement of liability due to an "unreasonable position" where the preparer "knew (or reasonably should have known) of the position." *Id.* § 6694(a)(1). A tax return preparer cannot be penalized for an unreasonable position if the preparer can show that "there is reasonable cause for the understatement and the tax return preparer acted in good faith." *Id.* § 6694(a)(3). Second, a tax return preparer may also be penalized pursuant to § 6694 in instances where an understatement of tax liability is the result of either a) "a willful attempt in any manner to understate the liability for tax on the return or claim" or b) "a reckless or intentional disregard of rules or regulations." *Id.* § U.S.C. § 6694(b). There is no reasonable cause/good faith defense to a § 6694(b) violation.

Here, the Government contends that Elsass and FRG have repeatedly understated the tax liability of their customers through the use § 165 theft-loss deductions based on willful or reckless conduct. Accordingly, before evaluating the conduct in question, a brief overview of the law governing § 165 theft-loss deductions is in order. Section 165 allows taxpayers to deduct

12

losses not "compensated for by insurance or otherwise." 26 U.S.C. § 165(a). Included within the permissible § 165 loss deductions for individuals are losses arising from theft. *See id.* § 165(c), (e). A theft loss might give rise to a net operating loss, which may be carried backward for up to three years and forward for twenty years. *See id.* § 172(a), (b)(1)(F). Further, characterizing a loss as resulting from theft rather than an ordinary capital loss is advantageous to a taxpayer because theft losses are not subject to the $3,000 cap applicable to capital losses. *See* 26 U.S.C. § 1211(b).

The term "theft" includes, but is not limited to, larceny, embezzlement, and robbery. *See* 26 C.F.R. § 1.165-8(d). According to the Fifth Circuit, theft is "a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile." *Edwards v. Bromberg*, 232 F.2d 107, 110 (5th Cir. 1956). To establish a theft loss, the taxpayer "must prove that the loss resulted from a taking of property that was illegal under the law of the jurisdiction in which it occurred and was done with criminal intent." Rev. Rul. 2009-9, 2009-14 I.R.B. 735 (citing Rev. Rul. 72-112, 1972-1 C.B. 60.). While an actual criminal conviction for theft is not required, it may establish conclusively that theft occurred. *See Vietzke v. Comm'r*, 37 T.C. 504, 510 (1961).

Losses for theft are "treated as sustained during the taxable year in which the taxpayer discovers such loss." 26 U.S.C. § 165(e). However,

> if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.

26 C.F.R. § 1.165-1(d)(3). *See also Jeppsen v. Comm'r*, 128 F.3d 1410, 1414 (10th Cir. 1997)

13

("the existence of a claim of reimbursement with a reasonable prospect of recovery will prevent a loss from being considered as 'sustained' unless and until it is determined with reasonable certainty that such reimbursement will not be obtained").  All facts and circumstances must be considered to determine if a taxpayer has a "reasonable prospect for recovery."  *See* 26 C.F.R. § 1.165-1(d)(2)(i).

"A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor."  *Ramsay Scarlett and Co., Inc., v. Comm'r*, 61 T.C. 795, 811 (1974).  Conversely, a taxpayer will not be prevented from claiming a theft loss where the possibility of recovery is "remote or nebulous."  *Vincentini v. Comm'r*, 429 F. App'x 560, 564 (6th Cir. 2011) (citing *United States v. S.S. White Dental Mfg. Co. of Pa.*, 274 U.S. 398, 402–03 (1927)).  "The 'reasonableness' of a taxpayer's prospect of recovery is primarily tested objectively, although a court may consider to a limited extent evidence of the taxpayer's subjective contemporaneous assessment of his own prospect of recovery."  *Jeppsen*, 128 F.3d at 1418.

Whether a reasonable prospect for recovery exists must be considered at the time the taxpayer elects to claim the theft-loss deduction.  *See Scofield's Estate v. Comm'r*, 266 F.2d 154, 163 (6th Cir. 1959) ("The only fair test is foresight, not hindsight.").  *See also Vincentini*, 429 F. App'x at 564 ("the Court must examine a taxpayer's reasonable expectations at the close of the taxable year in which the deduction was claimed").  Finally, the taxpayer bears the burden of establishing entitlement to a tax deduction.  *See Interstate Transit Lines v. Comm'r*, 319 U.S. 590, 593 (1943).  As such, a taxpayer is not entitled to a § 165 theft-loss deduction if the likelihood of recovery as of the end of the tax year in question is unknowable.  *See Jeppsen*, 128

F.3d at 1418. "Speculation and conjecture will not support a taxpayer deduction under [§ 165]." *Vincentini*, 429 F. App'x at 564.

The Government alleges that Elsass and FRG have repeatedly understated the tax liability of their clients by claiming improper theft-loss deductions in a manner penalizable under § 6694. The Government points the Court's attention to several purported financial "scams" involving the Defendants' customers and other of the Defendants' conduct, and has submitted evidence that in claiming theft losses arising from their customers' losses, Elsass and FRG: 1) claimed theft losses in cases where the losses were not criminal in nature under the relevant state law; 2) prematurely claimed theft losses before it could be ascertained with reasonable certainty that the customer had no reasonable likelihood of recovery; 3) claimed theft losses for persons not entitled to claim the loss; and 4) used incorrect tax forms to improperly inflate customers' refunds. The Court will thus next consider whether the theft loss deductions identified by the Government were improper, and, if so, whether Elsass and FRG's actions in serving as the tax return preparers for these deductions are subject to penalty under § 6694.

## I.

The first financial "scam" involved an entity named American Business Financial Services ("ABFS"), which sold high interest rate notes to investors backed by subprime mortgages. *See In re Am. Bus. Fin. Servs., Inc.*, 360 B.R. 74, 77 (Bankr. D. Del. 2007). ABFS ultimately became insolvent and filed for bankruptcy in January 2005. *Id.* As of 2010, Elsass and his companies prepared amended tax returns claiming theft losses for 372 customers who had lost their investments in ABFS. (United States' Statement of Contested and Uncontested Facts, ¶ 57, Doc. 229-1, PAGEID # 8207.) The Defendants' ABFS customers received collectively approximately $3.6 million in tax refunds as a result of these amended returns. (*Id.*)

The Government, however, contends that the theft losses claimed by the Defendants on behalf of their ABFS customers were improper and ignored the legal requirements for § 165 theft-loss deductions that the loss involve criminal intent and that the loss be claimed only after the taxpayer can establish with reasonable certainty that no recovery will be made.  The Court agrees.

No criminal charges were ever filed against ABFS or its principals.  The record includes an internal FRG document indicating awareness of this fact.  (*See* Gov. Ex. 3 at 2, Doc. 212-4, PAGEID # 4327.)  The record also includes a document titled "AMERICAN BUSINESS FINANCIAL SERVICES (ABFS) 165 (C)(2) SUMMARY" prepared by FRG corporate counsel Gwynn Kinsel, and used by FRG in attempting to justify ABFS theft-loss claims to the IRS. (*See* Gov. Ex. 24, Doc. 212-25.)  With regard to the issue of criminality, this document states in part:

> Here, ABFS induced investors to invest with their company based on false and misleading prospectuses and registration statements.  *Johnson v. American Business Financial Services*, No. 05-cv-00232 (E.D. Pa. 2005), Complaint at 7.  These actions by ABFS constitute theft by swindling or false pretenses….

> In addition, the principals of ABFS were using the investors' money for purposes not agreed to by the investors.  The principals of ABFS were paying themselves and family members exorbitant salaries and bonuses while the company was insolvent.  Also, the principals "essentially used ABFS as the Santilli family bank" and made excessive purchases that were not business related.  *Miller v. Santilli*, No. 1225, Commerce Program, Control Nos. 041182, 061519, 061580 (Philadelphia County Ct. C.P., July 2006) Op. at 3.  These actions amount to conversion, the taking of property of another without his or her permission or beyond the scope of the permission.  Gilbert Law Dictionary.  Again, this is a theft for § 165(c)(2) purposes.

> The Secretary of State in Illinois found the actions of ABFS to be fraud and conversion.  *In the matter of: Jerry Rapport and Anthony Santilli*, File No. 0500015, Temporary Order of Prohibition (Secretary of State, Ill.).  This finding is sufficient to prove that the actions of ABFS amounted to theft for 165(c)(2) purposes.

16

(*Id.* at 1, PAGEID # 4489.)

The information quoted above, may, at first blush, appear somewhat convincing. However, careful consideration reveals that the information borders on misleading and fails to establish the criminal intent requirement of a § 165 theft-loss deduction.  First, as noted by the Government, FRG's "proof" regarding the false prospectuses and registration statements comes from a complaint filed in a civil class action in the Eastern District of Pennsylvania.  As trained attorneys, Elsass and Kinsel were undoubtedly aware that allegations contained in a civil complaint are just that: allegations, which require actual evidence to establish.  Further, in the second paragraph quoted above, Kinsel cites a decision in a Pennsylvania state court in an action brought by George Miller, the trustee of ABFS' bankruptcy estate.  Perhaps in quoting an actual legal decision, Kinsel was hoping to add a sort of judicial imprimatur to FRG's position.  To the contrary, a review of the opinion reveals that in the cited portion, the Court was merely quoting directly from Miller's complaint in deciding a motion for judgment on the pleadings filed by the case's defendants.  (*See id.* at 23, PAGEID # 4511.)

The action taken by the Illinois Secretary of State and cited by FRG in the ABFS Summary is also of questionable relevance to the issue of criminal intent.  On April 8, 2005, the Secretary issued a document known as a temporary order of prohibition against ABFS itself and ABFS principals Anthony Santilli and Jerry Rappaport.  (*See* Gov. Ex. 7, Doc. 212-8.)  The Secretary's authority for issuing the temporary order of prohibition against ABFS arises under Section 11 of the Illinois Securities Law of 1953, 815 ILL. COMP. STAT. 5/11, which provides that:

> Anything herein contained to the contrary notwithstanding, the Secretary of State may temporarily prohibit or suspend, for a maximum period of 90 days, by an order effective immediately, the offer or sale or registration of securities ... without the notice and prior hearing in this subsection prescribed, if the Secretary

17

> of State shall in his or her opinion, based on credible evidence, deem it necessary
> to prevent an imminent violation of this Act or to prevent losses to investors
> which the Secretary of State reasonably believes will occur as a result of a prior
> violation of this Act…. The temporary order shall set forth the grounds for the
> action and shall advise that the respondent may request a hearing, that the request
> for a hearing will not stop the effectiveness of the temporary order and that
> respondent's failure to request a hearing within 30 days after the date of the entry
> of the temporary order shall constitute an admission of any facts alleged therein
> and shall constitute sufficient basis to make the temporary order final.

*Id.* 5/11(F)(2). While the Illinois Securities Law does establish criminal penalties, see id. 5/14,

the Court notes that the action taken by the Secretary regarding ABFS cited by the Defendants is

administrative in nature. Furthermore, the temporary order of prohibition, while immediately

effective, is akin to a complaint in a civil case in that the subjects of the order are provided an

opportunity to contest the allegations within the order at an administrative hearing.[2]

Accordingly, in justifying the ABFS theft-loss deductions, FRG and Elsass failed to

establish the requisite criminal intent. Several recent Court decisions reflect the absence of

evidence of this element. *See, e.g., Labus v. United States*, No. 5:11-cv-01856, 2012 WL

4483809, *4, 2012 U.S. Dist. LEXIS 139226, *10–*11 (N.D. Ohio Sept. 27, 2012) ("the record

is devoid of any evidence that would suggest that ABFS possessed the criminal intent to

'deprive' Plaintiff of his investment money without any plan of paying back the principal

investments. Instead, the record reflects that ABFS sent Plaintiff monthly interest checks from

his four investments for some time prior to filing for Chapter 7 bankruptcy. This fact alone

contradicts Plaintiff's contention in his complaint that ABFS acted with the criminal intent to

deprive him of his investment money."); *Wazgar v. United States,* No. 3:11-cv-311, slip op. at 2

---

[2] Some of the Defendants' materials defending ABFS claims reference *Vietzke v. Comm'r*, 37 T.C. 504 (1961) and claim that ABFS presents an analogous situation because of the Illinois Secretary of State's action against ABFS and its principals. (*See, e.g.*, Gov. Ex. 59 at 1, Doc. 213-33, PAGEID # 4837.) However, *Vietzke* is easily distinguishable as that case involved actual criminal convictions for securities law violations. *See Vietzke*, 37 T.C. at 509. As noted, on the other hand, the action by the Illinois Secretary of State is administrative in nature.

(S.D. Ohio Sept. 25, 2012) ("The Wazgars were not the victim of a 'theft' by AFBS as defined by applicable state law.").

In the portion of their brief in response to the Government's motion for summary judgment, the Defendants spend much of their argument attacking the deposition testimony of Catherine Johns and repeating the conclusory assertion that the ABFS losses were criminal in nature. However, this line of argumentation ignores the fact that the burden is on the taxpayer to establish the validity of a tax deduction. Just as with their interactions with the IRS, the Defendants have here failed to produce any evidence tending to establish the criminal nature of the ABFS losses.

The lack of criminality renders any prospective theft-loss deduction based on ABFS losses improper. According to the Government, however, even if ABFS losses could be considered criminal in nature, Elsass and FRG also improperly claimed 2005 as the year of discovery for such losses on 261 of the 263 amended returns related to ABFS filed between November 2007 and December 2009. (Pond Decl. ¶¶ 28–29, Gov. Ex. 491, Doc. 228-4, PAGEID # 8094.)

With regard to the year of discovery issue, the record reflects that after 2005, bankruptcy trustee George Miller was pursuing litigation to recover damages in excess of $800,000,000 for ABFS' creditors. (*See, e.g.,* Gov. Ex. 8 at 1, Doc. 212-9, PAGEID # 4350; Gov. Ex. 10, Doc. 212-11.) Class action litigation was also maintained on behalf of those who purchased notes from ABFS, and a settlement was achieved in 2008. (*See* Gov. Ex. 32, Doc. 213-6.) The record also includes an internal FRG document regarding ABFS stating the year of discovery as 2005, but also recognizing that the bankruptcy had only been initiated in January of that year. (*See* Gov. Ex. 1, Doc. 212-2.) This document also references the nearly $17 million class action

settlement reached in November 2008.  (*See id.*)

FRG's ABFS Summary used in responding to IRS concerns over theft-loss deductions taken by FRG's clients also attempts to justify 2005 as the correct year of discovery, stating that:

> Here, ABFS filed bankruptcy in January of 2005, and therefore the loss was discovered by investors in 2005.  Once the company filed bankruptcy, a reasonable person would believe that there was no prospect of recovery.  Then, in September of 2005 it became clear that there was not going to be any recovery based on the bankruptcy trustee's Status Update #1.  The update noted that ABFS's assets were estimated at $45,400,000 and the first secured lender has a secured debt of $75,000,000.  Therefore, once the secured debt is paid, there will be no money left over for the unsecured investors and thus there was no reasonable prospect of recover in 2005.

(Gov. Ex. 24 at 2–3, Doc. 212-25, PAGEID ## 4489–90.)

As with FRG's position regarding criminality, this information borders on misleading, ignores pertinent facts, and was used repeatedly by Elsass and FRG in attempting to justify ABFS theft-losses to the IRS.  For instance, Miller's first status update, dated September 1, 2005, does list available assets of $45,400,000 and secured debt belonging to Greenwich Capital of $75,000,000.  (*See* Gov. Ex. 25 at 3, Doc. 212-26, PAGEID # 4543.)  The update also mentions, however, that in addition to the $45 million in assets, there were 19 mortgage residuals known as "I/O Strips" pending valuation that could have been worth between $40 million and $180 million.  (*See id.*)  Subsequent status updates from 2005 were also ignored.  Update 3, dated November 1, 2005, for example, references partial payment made to Greenwich Capital and states that liquidation of the I/O strips plus other assets should be enough to cover the remaining debt.  (*See* Gov. Ex. 6 at 2, Doc. 212-7, PAGEID # 4334.)  The update goes on to state that "I cannot estimate, at this time, the amounts left for any other creditors."  (*Id.*)  Update 3 also mentions that Miller is exploring the possibility of litigation against various third parties, noting that recovery from litigation could take as long as three years.  (*See id.*)

From the record before it, the Court concludes that, even if ABFS losses could be considered criminal in nature, Elsass and FRG's attempt to claim 2005 as the year of discovery for many of their ABFS clients was not proper.  As noted above, it is a taxpayer's burden to prove a deduction.  Further, with regard to § 165 theft-loss deductions, if the likelihood of recovery at the end of a given tax year is simply unknowable, that year cannot be used as the year of discovery.  Here, the status updates produced by Miller in 2005 demonstrate that, at the very least, the prospects of recovery remained unknowable as of the end of that year because recovery efforts were only just beginning.  These reports show Miller's ongoing efforts to liquidate ABFS, to evaluate potential recoveries through litigation, and Miller's assertion that it was impossible to estimate possible returns for creditors other than Greenwich Capital.

Having determined that the theft-loss deductions related to ABFS investment losses claimed by Elsass and FRG were improper, the Court must now consider whether their conduct in claiming the deductions on behalf of their clients is subject to penalty under § 6694.  As an initial matter, the improper deductions resulted in an understatement of the tax liability for the Defendants' clients within the meaning of § 6694 by allowing the clients to claim inflated tax refunds.  *See* 26 U.S.C. § 6694(e) (understatement includes "overstatement of the net amount creditable or refundable").

Further, the Court concludes that there is no material issue of fact as to whether Elsass and FRG's conduct violated § 6694(b), which subjects to penalty understatements resulting from willful conduct or a reckless or intentional disregard for IRS rules and regulations.  The Treasury Department's regulations provide that "[a] preparer is considered to have willfully attempted to understate liability if the preparer disregards, in an attempt wrongfully to reduce the tax liability of the taxpayer, information furnished by the taxpayer or other persons."  26 C.F.R. § 1.6694-

21

3(b). "[W]illfulness does not require fraudulent intent or an evil motive; it merely requires a conscious act or omission made in the knowledge that a duty is therefore not being met." *Pickering v. United States*, 691 F.2d 853, 855 (8th Cir. 1982) (per curiam) (citations omitted).

With respect to reckless or intentional disregard of rules or regulations, the regulations provide that:

> a preparer is considered to have recklessly or intentionally disregarded a rule or regulation if the preparer takes a position on the return or claim for refund that is contrary to a rule or regulation … and the preparer knows of, or is reckless in not knowing of, the rule or regulation in question. A preparer is reckless in not knowing of a rule or regulation if the preparer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable preparer would observe in the situation.

26 C.F.R. § 1.6694-3(c)(1). The term "rule or regulation" is defined broadly to include the I.R.C., regulations issued under the I.R.C., and revenue rulings or notices published in the Internal Revenue Bulletin. *See id.* § 1.6694-3(e). Finally, the regulations provide that the Government bears the burden of proving that a preparer willfully understated tax liability but that the preparer bears the burden of proving that he or she did not recklessly or intentionally disregard a rule or regulation. *Id.* § 1.6694-3(h). *See also* 26 U.S.C. § 7427.

By continually insisting that 2005 was the proper year of discovery for purported ABFS theft losses, Elsass and FRG chose to distort and ignore pertinent information supplied by the bankruptcy trustee, George Miller, that strongly suggested that as of the end of 2005, the prospects for recovery were unknowable. Elsass personally instructed those completing ABFS amended tax returns to use 2005 as the year of discovery. (*See* Gov. Ex. 31, Doc. 213-5; Gov. Ex. 33, Doc. 213-7; Gov. Ex. 35, Doc. 213-9; Gov. Ex. 39, Doc. 213-13; Gov. Ex. 41, Doc. 213-15; Gov. Ex. 45, Doc. 213-19; Gov. Ex. 47, Doc. 213-21.)

Further, Elsass and FRG ignored the lack of criminal origin of the ABFS losses, which also demonstrates a reckless disregard for the criminality prerequisite of proper theft-loss deductions, as noted in revenue rulings.  *See* Rev. Rul. 2009-9, 2009-14 I.R.B. 735 (citing Rev. Rul. 72-112, 1972-1 C.B. 60.).  In this regard, Elsass is familiar with the legal precedent governing Section 165 theft-loss deductions.  (Elsass Dep. 157–58, Gov. Ex. 486, Doc. 226-2, PAGEID ## 7550–51.)  He is aware that the burden is on the taxpayer to prove every element of such a deduction:

> Q. Do you understand that there's a treasury regulation or a guidance saying you have to file certain things with the 165 claim to substantiate it?
>
> A. You have to prove the elements, and the burden of proof is upon the taxpayer. It says very clearly in the case law and the revenue rulings.

(*Id.* at 518, Doc. 227-3, PAGEID # 7731.)  Elsass is also aware that criminal intent is one of the required elements.  (*See id.* at 517–18, PAGEID ## 7730–31; 553–54, Doc. 227-4, PAGEID ## 7456–57.)  The record also reflects that FRG employees receive training from Elsass as to the requirements of § 165 theft-loss deductions.  (*See* United States' Statement of Contested and Uncontested Facts, ¶ 21, Doc. 229-1, PAGEID # 8195.)

The egregiousness of FRG and Elsass' conduct regarding ABFS is amplified by the fact that they continued to prepare hundreds of amended tax returns for their clients in the face of mounting IRS concerns.  Between November 2007 and December 2009, FRG made 263 theft-loss claims based on lost ABFS investments, the vast majority of which used 2005 as the year of discovery.  (Pond Decl. ¶¶ 28–29, Gov. Ex. 491, Doc. 228-4, PAGEID # 8094.)  However, during that same time period, the IRS sent 137 notices of disallowance regarding ABFS to the individual taxpayers and/or FRG employees.  (*Id.* ¶ 30, PAGEID # 8095.  *See also* Gov. Ex. 30 at 3, Doc. 213-4, PAGEID # 4579 (October 17, 2008 letter to taxpayers Donald and Zoe Sloan

explaining disallowance of claimed ABFS theft loss on ground that, inter alia, they failed to prove that theft had occurred).)  The first disallowance notice from the IRS is dated April 30, 2008.  (Gov. Ex. 461, Doc. 225-14.)  As of December 2009, FRG had filed 168 ABFS theft-loss claims *after* the IRS issued this first notice of disallowance.  (*Id.*)

The record also shows that, in filing and defending ABFS claims, Elsass and FRG continuously relied on the disingenuous legal and factual positions contained in their ABFS Summary as they responded to the concerns raised by the IRS regarding the claimed ABFS theft losses.  (*See, e.g.,* Gov. Ex. 40 at 1–2, Doc. 213-14, PAGEID ## 4684–85 (February 16, 2009 letter from Elsass and Kinsel to David Zito); Gov. Ex. 43 at 1, Doc. 213-17, PAGEID # 4709 (February 25, 2009 letter from Kinsel to Kimberly Putnam); Gov. Ex. 51 at 1, Doc. 213-25, PAGEID # 4802 (July 27, 2009 letter from FRG Corporate Counsel Laurie Wirt to Stephen Martin); Gov. Ex. 52 at 1, Doc. 213-26, PAGEID # 4818 (August 18, 2009 letter from Kinsel to Carmen Urquia); Gov. Ex. 56, Doc. 213-30 (October 29, 2009 letter from Kinsel to Shelly Welker); Gov. Ex. 57, Doc. 213-31 (November 5, 2009 letter from Wirt to D. Caiazza); Gov. Ex. 59, Doc. 213-33 (November 23, 2009 letter from Kinsel to Greg Nygren); Gov. Ex. 62, Doc. 213-36 (March 11, 2010 letter from Wirt to S. Pritchard); Gov. Ex. 65 at 4–6, Doc. 213-38, PAGEID ## 4904–06 (April 6, 2010 letter from Wirt to Steven Rowe); Gov. Ex. 67 at 2–3, Doc. 213-40, PAGEID ## 4915–16 (June 9, 2010 letter from Chad Dworkin of FRG to Thomas Hynes); Gov. Ex. 68 at 1–2, Doc. 214, PAGEID ## 4917–18 (June 14, 2010 letter from Wirt to David Evans); Gov. Ex. 70 at 9–10, Doc. 214-2, PAGEID ## 4931–32 (July 20, 2010 letter from Christopher Camboni of FRG to Anne Fleming); Gov. Ex. 473 at 1–2, Doc. 225-25, PAGEID ## 7207–08 (March 27, 2009 letter from Kinsel to Luis Repollet).)

In concluding its discussion of ABFS, the Court draws attention to Government Exhibit

309, which, in the Court's view, serves to illustrate the callousness toward the theft-loss rules and regulations demonstrated by Elsass and FRG. That exhibit is an internal FRG document listing the years of discovery for various scams researched by FRG. ABFS is listed in 2005, but includes a notation that says, "Per Toby this can be put in '06 if it works better." (Gov. Ex. 309 at 1, Doc. 220-5, PAGEID # 6330.) For the above-stated reasons, the Court concludes that Elsass and FRG, acting as tax return preparers, improperly claimed § 165 theft-losses on behalf of clients who had suffered losses of ABFS investments, and that FRG and Elsass' conduct in doing so is subject to penalty under § 6694(b).

## II.

The second scam cited by the Government involved Joanne and Alan Schneider, who orchestrated a massive Ponzi scheme by selling high-return promissory notes to investors and then paying the interest owed to earlier investors with cash received from later investors. *See Cramer v. United States*, 885 F. Supp. 2d 859, 860 (N.D. Ohio 2012). Between April 2006 and January 2010, FRG was involved in making 30 theft-loss claims related to the Schneiders' scheme, with the IRS sending a total of 29 notices of disallowance related to those claims to FRG clients and/or FRG employees. (Pond Decl. ¶¶ 32–33, Gov. Ex. 491, Doc. 228-4, PAGEID # 8095.) After receiving the first notice of disallowance in March 2007, FRG served as tax return preparer for 19 additional Schneider theft-loss claims. (*Id.* ¶ 34.) The Government concedes that the Schneider Ponzi scheme was criminal in nature, but instead contends that Elsass and FRG willfully and/or recklessly filed theft-loss claims using improper years of discovery. The Court again agrees.

The chronology relevant to the Schneiders' scheme was summarized by Judge Oliver as follows:

The Ohio Department of Commerce ("ODC") filed *ODC v. Schneider* on Dec. 1, 2004 in the Cuyahoga County Court of Common Pleas in order to stop the Schneiders from selling unsecured promissory notes. The ODC successfully obtained a preliminary injunction against the Schneiders.  The court also appointed a special master—Matthew Fornshell, former director of enforcement for the Ohio Division of Securities—to supervise compliance with the injunction…. By the time the suit was filed, the Schneiders owed approximately $60 million in unpaid notes, but none of the notes were in default as of December 2004.  The Schneiders continued to sell the notes in violation of the court's order until February 2005 when their assets were frozen.  The court then elevated Fornshell to Receiver to oversee the liquidation of the Schneiders's assets and the distribution of those assets to investors.

In his capacity as Receiver, Fornshell filed periodic updates with the court. In a filing made on [sic] December 2008 as part of the *ODC v. Schneider* litigation, the Receiver reported that the liquidation of the Schneiders's assets yielded a total of $20,955,622.98.  In the same report, the Receiver also told the court it was unknown how much of the Schneiders's assets would be distributed to unsecured investors until the claims of secured investors were resolved.  Of that approximately $21 million, secured creditors eventually made claims in the amount of $20 million dollars.

Plaintiffs were also involved in two other suits concerning their investments with the Schneiders, both filed by the Receiver.  The first suit was *Kathy Young v. First Merit Bank*, filed on May 10, 2006 and the second was *Fornshell v. FirstMerit Corp.*, filed on May 24, 2006.  *Fornshell* was brought by the court-appointed Receiver on behalf of unsecured creditors.  Plaintiffs recovered 17% of their investment, in the amount $11,900, on December 12, 2011 from a settlement in *Forshnell v. FirstMerit*.  On December 27, 2011, the Receiver notified unsecured investors that he did not expect additional funds to become available for reimbursement.

*Cramer*, 885 F. Supp. 2d at 860–61 (citations omitted).

FRG initially submitted amended tax returns on behalf of clients claiming Schneider theft losses using 2004 as the year of discovery.  (Gov. Ex. 95, Doc. 214-25; Gov. Ex. 97, Doc. 214-27; Gov. Ex. 98, Doc. 214-28.)  The IRS then began to disallow these claimed theft losses on the ground that, as of the end of 2004, the potential for recovery remained unknown.  (*See* Gov. Ex. 109 at 4, Doc. 214-39, PAGEID # 5141.)  Significantly, Elsass and FRG continued to market 2004 as the year of discovery to potential clients *after* the IRS began determining that the use of

2004 was improper.  (*See* Gov. Ex. 113, Doc. 215-2 (March 5, 2008 letter from Elsass to potential customers identifying 2004 as Schneider year of discovery); Gov. Ex. 109 at 4, Doc. 214-39, PAGEID # 5141 (November 2007 notice of disallowance of Schneider theft-loss claim of Richard Pavlich on the grounds that taxpayer could not establish that no reasonable prospect for recovery existed in 2004).)

For several customers for whom the IRS ruled that 2004 was not a proper year of discovery, Elsass and FRG would re-file claims using later years of discovery.  (*See* Gov. Ex. 106, Doc. 214-36; Gov. Ex. 118, Doc. 215-7; Gov. Ex. 119, Doc. 215-8; Gov. Ex. 123, Doc. 215-12; Gov. Ex. 130, Doc. 215-19.)  For example, FRG used 2007 as the year of discovery in several instances, including for some taxpayers for whom it had initially used 2004.  (*See* Gov. Ex. 121, Doc. 215-10; Gov. Ex. 124, Doc. 215-13; Gov. Ex. 126, Doc. 215-15.)  As with the 2004 amended returns, the IRS also denied 2007-Schneider claims on the ground that recovery was still possible as of that time.  (Gov. Ex. 61 at 20, Doc. 213-35, PAGEID # 4864 (March 10, 2010 notice of disallowance regarding Schneider theft-loss claimed by Stephen and Karen Wazgar on the grounds, inter alia, there existed a potential future recovery in 2007).)

As the IRS indicated in its disallowance notices, it was improper for Elsass and FRG to use years between 2004 and 2007 as the year of discovery for Schneider theft-loss deductions because reasonable prospects for recovery existed during that time period or the prospects were simply unknowable.  As of the end of 2004, recovery efforts were only in there very initial stages and, as of the end of 2007, the recovery efforts remained ongoing.  The Ohio Department of Commerce had initiated litigation against the Schneiders in late 2004, and, as of December of that year, the Cuyahoga County Court of Common Pleas had only just appointed Fornshell as special master to evaluate the Schneiders' plan to repay investors.  (*See* Gov. Ex. 80 at 2, Doc.

214-11, PAGEID # 5052.)  As of that time, the Schneider's had not yet defaulted on the notes. *Cramer*, 885 F. Supp. 2d at 861.

The record contains a declaration from Schneider receiver Matthew Fornshell.  In it, Fornshell describes instances where Elsass contacted him in failed efforts to obtain a list of investors who lost money to the Schneider scheme.  (*See* Fornshell Decl. ¶¶ 4–5, Gov. Ex. 493, Doc. 228-6, PAGEID # 8108–09.)  According to Fornshell, efforts to recover money for the Schneiders' creditors began in February 2005 and remain ongoing.  (*Id.* ¶ 3, PAGEID # 8108.) Further, Fornshell states that, in the early stages of the receivership, his consistent response to inquiries from investors concerning recovery of lost funds was "that I was unable to determine the amounts that would be distributed with any degree of certainty."  (*Id.* ¶ 9, PAGEID # 8109.)

The record also contains a March 2006 email from Fornshell describing the prospects for recovery for the unsecured Schneider investors.  (*See* Gov. Ex. 104, Doc. 214-34.)  In the email, Fornshell discusses the proposed liquidation of Schneider assets, concluding that of the $15-$20 million likely to be realized through liquidation, all but $2-$4 million would likely be paid to secured creditors.  (*See id.*)  The remaining $2-$4 million would be used to compensate the unsecured investors and pay fees.  (*See id.*)  Significantly, however, Fornshell also mentions the prospect of litigation against third parties, stating that proceeds would benefit unsecured creditors, but that a successful result could take as long as two years.  (*See id.*)  Elsass received this email in March 2007.  (*See id.*)  As noted by Judge Oliver, the liquidation actually yielded about $21 million, with $20 million claimed by secured creditors.  Fornshell's litigation was also successful—resulting in a settlement and some recovery to unsecured investors.  However, as of the time Fornshell sent the email, possible recovery on the litigation remained up to two years in the future, or around March 2008 in a worst-case scenario.  (*See also* Gov. Ex. 100 at 1, Doc.

214-30, PAGEID # 5120 (January 22, 2007 letter from Fornshell to Schneider investors providing update on recovery efforts, states "While it is difficult to set specific time lines for determining when distributions can be made, and to whom they can be made to, I anticipate that process will begin during the first half of 2007.").)

As noted previously, the burden is on the taxpayer to prove entitlement to a deduction, and where the prospect of recovery is unknowable in a given year, that year cannot serve as the year of discovery for a theft-loss deduction. Here, given the unknowable prospects for recovery at the end of 2004, evidenced by the fact that recovery efforts had only just begun, and the ongoing recovery efforts of Fornshell through 2007, which would have appeared promising as of the end of that year for at least partial recovery based on the incomplete liquidation of the assets seized from the Schneiders and the third-party litigation, Elsass and FRG simply could not establish that no reasonable prospects for recovery existed either as of the end of 2004 or the end of 2007. Judge Oliver reached essentially the same conclusion in both *Cramer* and *Zinn v. United States*, 885 F. Supp. 2d 866 (N.D. Ohio 2012)—granting summary judgment to the Government on the grounds that the taxpayers lacked evidence to establish that no reasonable prospects for recovery existed with regard to the Schneider scheme in 2004 or 2007. *See Zinn*, 885 F. Supp. 2d at 874 ("The court agrees with Defendant, and finds that there is insufficient evidence from which a reasonable jury could find Plaintiffs had no reasonable prospect of recovery at the close of 2004. More specifically, Plaintiffs have not provided evidence to rebut the inference that the filing of *ODC v. Schneider* litigation at the close of 2004 presented a reasonable prospect of recovery."); *Cramer*, 885 F. Supp. 2d at 866 ("Plaintiffs have presented no evidence that as of December 31, 2007, their chances of recovery from [the] third-party litigation was nebulous or remote.").

Further, there is no material dispute of fact as to whether Elsass and FRG acted willfully and/or recklessly or intentionally disregarded rules and regulations in violation of § 6694(b) by claiming Schneider theft losses using either 2004 or 2007 as the year of discovery.  As with the ABFS claims, in making the Schneider claims, Elsass and FRG ignored critical information and the precedent and law surrounding theft-loss deductions, and continued to file claims even in the face of frequent IRS disallowances.  Elsass, who was in communication with Fornshell, was aware that recovery efforts were merely beginning or remained ongoing during the 2004 through 2007 timeframe, and was also attuned to the specific details of Fornshell's efforts.  (*See* Gov. Ex. 89, Doc. 214-20.)  In a February 23, 2006 email to a potential client, Elsass stated that "I have been investigating Schneider for over 4 months now.  I have and do attend all the court proceedings and work with the attorneys involved gathering information."  (Gov. Ex. 85, Doc. 214-16, PAGEID # 5061.)

In a February 2007 letter to the IRS defending the claim of David and Elaine Kosco, which used 2004 as the year of discovery, Elsass stated:

> The litigation against the Schneider's started in 2004 and a receiver was appointed.  All the investors including the taxpayers were notified of the case in 2004.  ***After a few months*** it became obvious that the only parties that would get paid were the financial institutions that held first mortgages on the properties.

> The holders of promissory notes without a corresponding mortgage on real property, like the taxpayers, will receive nothing in the civil case.  There is [sic] not enough recovered assets to pay all the secured investors with mortgages including the banks.

> I personally attended the hearings on this case until it was determined that the unsecured note holders would receive nothing.

(Gov. Ex. 103 at 1, Doc. 214-33, PAGEID # 5128 (emphasis supplied).)  This letter typifies Elsass/FRG's defense of the Schneider claims as it ignores and distorts certain facts, and ignores the law governing theft-loss deductions.  First, it was never (at least not as of February 2007)

determined by the receiver or court that unsecured note holders would receive nothing. As noted above, Fornshell only reported to the court in December of 2008 the final tally yielded by the liquidation of the Schneiders' assets and that it was unknown how much would be distributed to the unsecured creditors. *Cramer*, 885 F. Supp. 2d at 861. Second, Elsass' letter ignores the potential for recovery in the third-party litigation initiated by Fornshell. Third, contained within the letter itself is a reason why the prospects for recovery were unknowable in 2004—the Ohio Department of Commerce litigation against the Schneiders began on December 1st of that year and Elsass states that his conclusion regarding possible recovery is based on what became obvious (at least to Elsass) "after a few months," or necessarily sometime in 2005. Finally, the letter ignores the possibility that unsecured investors had of recovering at least part of their investments.

### *III.*

The third so-called "scam" identified by the Government involves an entity known as OneCap Mortgage ("OneCap"). As of the filing of the summary judgment motions in this case, FRG customers had filed claims for tax refunds arising from OneCap losses of at least $4.3 million. (Gov. Ex. 173, Doc. 216-25.) The Government has filed as exhibits various amended tax returns claiming OneCap theft losses for which Elsass and FRG served as tax return preparers. (*See* Gov. Ex. 147, Doc. 215-36; Gov. Ex. 148, Doc. 215-37; Gov. Ex. 149, Doc. 215-38; Gov. Ex. 151, Doc. 216; Gov. Ex. 153, Doc. 216-2.) However, as with ABFS and the Schneider Ponzi scheme, the claimed theft-losses filed on behalf of OneCap investors were improper.

OneCap was a mortgage broker that used a business model known as first trust deed investing. (Williams Dep. 17, Gov. Ex. 172, Doc. 216-22, PAGEID # 5746.) First trust deed

investing involves the use of investors' money for specific land purchases in exchange for a monthly interest payment to the investors. (*Id.*)  With the downturn in the housing market, OneCap's business failed and it declared bankruptcy in 2010. (*See id.* 29–30, PAGEID ## 5757–58.)  Specifically, because of the market downturn, OneCap properties stopped selling and OneCap was forced to foreclose on borrowers. (*See id.*)  As a result, instead of receiving interest payments, OneCap investors became owners through foreclosure of the depreciated properties in which they had invested. (*See id.*)

Heidi Williams was a vice president of OneCap for approximately five years and considered herself to be among the three individuals at the company with the most responsibility. (*See id.* at 21–23, PAGEID # 5749–51.)  Williams is unaware of any fraud or mismanagement at OneCap. (*Id.* at 32, PAGEID # 5760.)  According to her, OneCap was in no way a Ponzi scheme because investors' money was invested in specific properties and the investors thus became owners of the properties. (*Id.* at 33–34, Doc. 216-23, PAGEGID # 5761–62.)  Further, Williams testified that OneCap investors were given disclosures regarding the risks of the investments. (*See id.* at 25–27, Doc. 216-22, PAGEID ## 5753–55.)  These disclosures and disclaimers were consistent with what was required by Nevada law. (*Id.* at 28, PAGEID # 5756.)

Prior to filing for bankruptcy, OneCap was subject to investigations by the Nevada Department of Business and Industry, Division of Mortgage Lending and Financial Institutions Division. (*See id.* at 36, Doc. 216-23, PAGEID # 5764.)  These investigations began in 2007 and lasted until 2009, and resulted in the surrender of OneCap's mortgage broker license. (*See id.* at 37–39, PAGEID ## 5765–66.)  According to Williams, the license was voluntarily surrendered because there was no need to keep the license as OneCap's mortgage business had ceased. (*See id.* at 39, PAGEID # 5766.)  No criminal charges related to OneCap's failure have ever been

brought.  Further, Williams is unaware of any allegation by any governmental authority that OneCap committed fraud.  (*Id.* at 168, Doc. 216-24, PAGEID # 5794.)  Rather, the Nevada state investigations into OneCap were related to actions taken by OneCap for which OneCap lacked a proper license and certain transactions that lacked the required collateral in the form of real property.  (*See id.* at 167.)

As with ABFS, FRG and Elsass failed to demonstrate that the losses to OneCap investors resulted from criminal intent.  To the contrary, it appears that investments into OneCap were but another casualty of the steep decline in the national housing market during the Great Recession of the late 2000s.  Despite this, Elsass and FRG, through their agents, aggressively defended the claimed OneCap theft-loss deductions.  The following passage from a letter to the IRS signed by attorney Thomas Sooy on behalf of an FRG customer typifies the position taken by FRG on behalf of its OneCap clients regarding the criminal intent issue:

> Nevada law provides in relevant part that "a person commits theft if, without lawful authority, the person knowingly…obtains real, personal, or intangible property or services of another person by a material misrepresentation with intent to deprive that person of the property or services."  Enclosed please find a copy of the State of Nevada Department of Business and Industry Division of Mortgage Lending Order to Cease and Desist from October 2007.  This document outlines the fraudulent activities of OneCap and the misrepresentations it made to investors, including the Taxpayers, about the company.  Essentially what OneCap was doing was engaging in the brokering of loans which were not secured by real property, a violation of the Securities Laws of the State of Nevada.  The misrepresentation for purposes of how OneCap violated Nevada theft law came in the form of how they created confusion as to the identity of the company and where investor money was really going.  This is outlined in the Cease and Desist.  Subsequently the Division amended its Cease and Desist and eventually in May 2010, revoked OneCap's mortgage broker's license for failure to comply with the various agreements made between the Division and OneCap throughout this process.

(Gov. Ex. 164 pt. 1 at 2–3, Doc. 216-13, PAGEID ## 5504–05.  *See also* Gov. Ex. 160, Doc. 216-9; Gov. Ex. 163, Doc. 216-12; Gov. Ex. 165, Doc. 216-15; Gov. Ex. 167, Doc. 216-17; Gov.

Ex. 168, Doc. 216-18; Gov. Ex. 169, Doc. 216-19; Gov. Ex. 170, Doc. 216-20.)

It is true that OneCap was investigated by the Nevada Department of Business and Industry, which issued cease and desist orders against it in October 2007. However, there is nothing in the record to suggest that the proceedings before the Department, which culminated in the loss of OneCap's mortgage broker license, were anything other than administrative in nature. Further, and perhaps even more fatal to FRG's position regarding the criminal intent issue, there is no indication that the conduct cited by FRG's agents in defending the OneCap theft-loss deductions actually caused the losses to OneCap's investors. For instance, FRG made much of the fact that OneCap had been cited in the Cease and Desist Order issued by the Division of Mortgage Lending for making material misrepresentations. However, a review of the order itself reveals that "misrepresentations" for which OneCap was cited in violation of Nevada law related to the confusion created by the fact that OneCap operated using a series of similarly named entities with the identity of the entity possessing the mortgage broker license being difficult to ascertain. In this regard, the order states that:

> The practical effect of this business structure is that neither the Division [of Mortgage Lending] nor the complaining parties are able to discern whether the RESPONDENT or some other unlicensed affiliate of RESPONDENT is the party with whom certain real estate transactions were consummated. Thus, insofar as members of the public are concerned, RESPONDENT and all of its related entities are viewed as mere components of the confusingly vague and generalized "ONECAP" identity.

(Gov. Ex. 164 pt. 2 at 18, Doc. 216-14, PAGEID # 5561.)

On the other hand, Williams' testimony that the losses to OneCap investors were caused by market forces is undisputed. Accordingly, even if the illegal business practices of OneCap could be considered criminal in nature, the Defendants are unable to show that the actual losses to OneCap investors were caused by those practices. In other words, the fact that OneCap may

have used a confusing array of similarly named legal entities had nothing to do with why the taxpayers' investments turned sour.  Relatedly, the fact that OneCap made loans unsecured by real estate in contravention of Nevada legal requirements is not related to the losses.  Nor is such conduct, standing alone, criminal in nature.

FRG and Elsass' efforts to bring theft-loss deduction claims before the IRS on behalf of OneCap investors essentially boil down to the use of non-criminal legal infractions, unrelated to the actual reasons why investors lost their money, in an attempt to portray a seemingly legitimate (albeit risky) mortgage business as a massive criminal enterprise.  The Court, therefore, concludes that their conduct as tax return preparers for the OneCap claims was willfull and/or constituted a reckless or intentional disregard for the IRS' rules and regulations in violation of § 6694(b).

In responding to the Governments' motion for summary judgment, Defendants argue that OneCap losses were caused by criminal intent, and attempt to support this conclusion by stating that Heidi Williams may have been under the influence of drugs during her deposition, and by pointing to an FBI investigation in addition to citing the cease and desist orders issued by the Nevada regulatory authorities.  However, neither unsupported speculation about whether Williams was impaired during the deposition, nor the FBI investigation—a seemingly ongoing investigation of which the Defendants have failed to produce any evidence concerning its conclusions—serve to create a material issue of fact regarding the issue of criminal intent.  For instance, what if the ongoing FBI investigation were to completely exonerate OneCap and its principals of any criminal wrongdoing?  Without evidence concerning the FBI's ultimate conclusions, the mere fact that an investigation is occurring does not establish criminal intent.

For the above-stated reasons, the Court concludes that there is no issue of material fact as

to whether Elsass and FRG violated § 6694(b) through serving as tax return preparers for improper theft-loss deductions arising from investor losses in OneCap.

## IV.

In addition to claiming theft-losses improperly as described *supra*, the Government also contends that Elsass and FRG violated § 6694 by using an incorrect tax form to claim theft-loss deductions. According to the Government, use of the form in question—IRS Form 4797—can lead to larger refunds than a taxpayer should be entitled.

Pursuant to the I.R.C., theft-loss deductions are characterized as itemized deductions, meaning essentially that they are tax deductions made from adjusted gross income ("AGI") after AGI is calculated from gross income. *See* 26 U.S.C. §§ 61 (defining "gross income"), 62(a) (defining AGI as gross income less enumerated deductions specified in subsection 62(a)), 63(d) (defining "itemized deductions" as "the deductions allowable under this chapter other than …the deductions allowable in arriving at adjusted gross income").[3] The I.R.C. contains at least one wrinkle that would allow theft-loss deductions to be treated as non-itemized deductions, or deductions taken from gross income on the way to calculating AGI. Pursuant to § 62(a) of the I.R.C., AGI is defined as follows:

> For purposes of this subtitle, the term "adjusted gross income" means, in the case of an individual, gross income minus the following deductions:
>
> **(1) Trade and business deductions**
>
> The deductions allowed by this chapter (other than by part VII of this subchapter) which are attributable to a trade or business carried on by the taxpayer, if such trade or business does not consist of the performance of services by the taxpayer as an employee.
>
> …

---

[3] Further, § 165 itself is located in I.R.C. Subtitle A, Chapter 1, Subchapter B, Part VI, which is titled "Itemized Deductions for Individuals and Corporations."

*Id.* § 62(a)(1). Section 165 is within Part VI of the same chapter of the I.R.C. as § 62, so a theft associated with the operation of a business could be considered a deduction under the above-quoted provision. However, in the absence of this limited exception, theft losses must be characterized as itemized deductions.

Theft loss deductions are thus usually correctly claimed by taxpayers using Form 4684, titled "Casualties and Thefts."[4] The calculations from Form 4684 in turn feed into line 20 of Form 1040, Schedule A, which is the schedule used to total itemized deductions. Itemized deductions are then reported on line 40 of Form 1040 (if of course the itemized deductions are greater than the standard deduction) to be subtracted from AGI at line 41.

Form 4797, on the other hand, is titled "Sales of Business Property (Also Involuntary Conversions and Recapture Amounts Under Sections 179 and 280F(b)(2))." Even ignoring the obvious conceptual difficulty of fitting something related to a "theft" on a form that on its face mainly relates to "sales," Part I of Form 4797 is titled "Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions From *Other Than Casualty or Theft*—Most Property Held More Than 1 Year." (Emphasis supplied.) Part II is titled "Ordinary Gains and Losses." Significantly, losses calculated using Form 4797 are subtracted from total income at line 14 of Form 1040 on the way to calculating AGI.

The characterization of a deduction as "above the line" (a deduction from gross income as opposed to AGI) using Form 4797 can have significant consequences for overall tax liability. As Government expert Gary Zwick explains:

> For federal income tax purposes, it may matter whether a theft loss deduction is claimed *before* arriving at adjusted gross income (improperly, using Form 4797) or *after* arriving at adjusted gross income (properly, using Form 4684 and Schedule A). In certain tax years, there have been (and there are now again)

---

[4] Tax forms cited herein can be accessed at: http://www.irs.gov/Forms-&-Pubs.

phase-outs of certain itemized deductions when a taxpayer's adjusted gross income was too high, such that a taxpayer could lose the ability to claim up to 80 percent of his itemized deductions if his adjusted gross income was too high.  In this situation, placing the deduction on Form 4797 reduces the taxpayer's adjusted gross income and could increase his ability to claim higher amounts for his itemized deductions.

Further, there are many states, including Ohio, that calculate tax using a taxpayer's federal adjusted gross income without giving credit for itemized deductions as the federal government does.  So claiming a theft loss deduction properly on Schedule A for an Ohio taxpayer would not reduce that person's Ohio state taxes at all and would not generate a refund.  Improperly using Form 4797, however, generates a lower federal adjusted gross income for an Ohio customer. That way, the customer's Ohio state tax return can be amended with the lower adjusted gross income, which generates a state tax refund and thus, a higher fee for the Defendants.

(Zwick Decl. ¶ 19.h–i, Gov. Ex. 488, Doc. 228-1, PAGEID # 8066 (emphasis in original).)

As alluded to by Zwick, § 68 of the I.R.C. provides limitations on the amount of itemized deductions a taxpayer may take with the limitations applying after a taxpayer's AGI exceeds a certain threshold.  *See* 26 U.S.C. § 68.  Further, § 67 applies to certain itemized deductions and prohibits those deductions if, in the aggregate, they do not exceed 2% of a taxpayer's AGI.  *See id.* § 67(a).  Accordingly, lowering a taxpayer's AGI through an above-the-line deduction would be advantageous to a taxpayer attempting to overcome the 2% threshold.  As for the issue of state income taxes, Elsass is aware that using Form 4797 can make a difference when attempting to get a state tax refund.  (Elsass Dep. 824, Gov. Ex. 486, Doc. 227-12, PAGEID # 7945.)

The Government has identified 110 amended tax returns, filed between 2007 and 2010 by or on behalf of FRG customers claiming theft-loss deductions by using Form 4797.  (Pond Decl. ¶ 9, Gov. Ex. 491, Doc. 228-4, PAGEID # 8093. *See also* Gov. Ex. 12, Doc. 212-13; Gov. Ex. 18, Doc. 212-19; Gov. Ex. 46, Doc. 213-20.  *Compare* Gov. Ex. 121, Doc. 215-10 (amended 2007 federal return of David and Elaine Kosco with theft loss shown as a reduction in AGI) *with* Gov. Ex. 120, Doc. 215-9 (amended 2007 Ohio return of the Koscos with refund generated

38

through reduced federal AGI).) Elsass himself signed 109 of those forms. (Pond Decl. ¶ 9, Gov. Ex. 491, Doc. 228-4, PAGEID # 8093.)

The record also reflects (and is undisputed) that the amended returns were improperly yet consciously filed using Form 4797 at the direction of FRG and Elsass to improve the customers' tax positions. According to Kinsel, when the customers' losses could not be extended forward or backward, Elsass instructed employees and contractors of FRG to use Form 4797 for the purpose of entitling the customer to additional deductions or state refunds through lowered AGI. (Kinsel Decl. ¶ 12, Gov. Ex. 492, Doc. 228-5, PAGEID ## 8100–01.) Elsass himself admitted that Form 4797 was used by FRG to obtain state income tax refunds in this manner. (*See* Elsass Dep. 809, Gov. Ex. 486, Doc. 227-11, PAGEID # 7934.)

There is no indication that any of FRG's Form 4797 clients could fit under the exception that would potentially allow a taxpayer to claim a theft loss above the line. For instance, many of the 4797 tax returns relate to ABFS losses, (see Gov. Ex. 199, Doc. 217-15), and there is simply nothing to indicate that individual taxpayers who invested in ABFS could be considered to have sustained their losses through a trade or business "carried on" by the individual taxpayers in question per § 62(a)(1). Rather, the instructions prepared by Elsass/FRG for amended returns reflect "shopping" between claiming the theft loss above versus below the line. On one set of such instructions sent by Elsass he stated "Process as a 4797 if its [sic] better". (Gov. Ex. 45, Doc. 213-19. *See also* Gov. Ex. 119, Doc. 215-8 (August 26, 2008 instructions for Schneider losses, "We can do this as a 4797 since it is confined to one year."); Gov. Ex. 190, Doc. 217-1 (October 3, 2008 instructions sent by Elsass to use Form 4797 to claim theft loss; "Do AS A 4797 to obtain State of CA for 2006"); Gov. Ex. 476, Doc. 225-28 (April 17, 2008 instructions sent by Elsass to use Form 4797 to claim ABFS theft loss).)

Finally, Government Exhibit 469, a 2005 amended tax return prepared by FRG for taxpayers Douglas and Mary Theaker, illustrates how using Form 4797 could serve to inflate a federal tax refund.  For the Theakers, FRG used Form 4797 to claim a $63,262 ABFS loss, which lowered the Theakers AGI from $178,172 to $114,910.  (Gov. Ex. 469 at 1, 10, Doc. 225-21, PAGEID ## 7191, 7200.)  The lowering of their AGI allowed the Theakers to increase their itemized deductions and ultimately their claimed refund.  In this regard, Schedule A of Form 1040 for 2005 indicates that itemized deductions could be limited for taxpayers with an AGI of over $145,950.  (*See id.* at 7, PAGEID # 7197.)  Conveniently, using Form 4797 for the above-the-line deduction lowered the Theaker's AGI below that threshold.  Further, the medical and dental expense itemized deduction was limited to those expenses in excess of 7.5% of AGI.  (*See id.*)  *See also* 26 U.S.C. § 213(a) (prior to 2010 amendment raising threshold to 10%, medical expenses deductible to the extent in excess of 7.5% of AGI).  By lowering their AGI, the Theakers were able to claim as an itemized deduction $12,493 of their $21,111 in medical expenses as opposed to the $7,748 they would have been able to deduct had their AGI remained at $178,172.  (*See* Gov. Ex. 469 at 7, Doc. 225-21, PAGEID # 7197.)  Accordingly, by claiming the theft loss deduction using Form 4797, the Theakers were able to increase their itemized deductions by $5,712, which served to increase their claimed refund of $17,950.  (*Id.* at 1, PAGEID # 7191.)  The Theaker's purported theft loss was later redone below the line.  (*See* Gov. Ex. 58, Doc. 213-32.)

Having determined that the record is undisputed that Elsass and FRG improperly used Form 4797 in an attempt to generate higher federal and state tax refunds (and thus higher fees for FRG), the Court also concludes that such conduct is penalizable under § 6694(b).  The conclusion that theft losses claimed by Elsass and FRG's clients should have been characterized

40

as itemized deductions using Schedule A to Form 1040 and Form 4684 as opposed to above-the-line deductions using Form 4797 is reached by the simple examination of §§ 61 and 62 of the I.R.C. explained above. In addition to basic statutory interpretation, the conclusion is supported by the obvious conceptual difficulties of using Form 4797 in the context of theft—essentially trying to fit a square peg in a round hole—coupled with the fact that a specific form exists covering theft losses.[5] Given that the proper characterization of itemized deductions is so easily ascertainable, especially to a person such as Elsass who possesses a law degree and holds himself out as an expert in theft-loss deductions, the improper use of Form 4797 by Elsass and FRG at the very least constitutes a reckless disregard for the I.R.C. and the tax rules and regulations in violation of § 6694(b).

## *V.*

Next, the Government asserts that Elsass and FRG violated § 6694 by serving as tax return preparers for taxpayers claiming personal theft-loss deductions arising from the investment losses of deceased relatives. Such a deduction would be improper even if a valid theft loss had occurred as a relative of the deceased taxpayer would have no personal basis in the investment. *See Reed v. Comm'r*, 51 T.C.M. (CCH) 1078 (1986) ("To qualify for a theft loss deduction, a taxpayer must establish his basis in inherited property before such loss can be determined."); 26 U.S.C. § 102 (income from inheritance ordinarily not taxable).

Deborah Heidell was such a customer on whose behalf FRG served as tax return preparer. Heidell's deceased mother-in-law had lost more than $94,000 in a Ponzi scheme. (Heidell Decl. ¶ 4, Gov. Ex. 489, Doc. 228-2, PAGEID # 8077.) Upon the death of her husband,

---

[5] The conceptual difficulty of using Form 4797 is again illustrated by the Theakers amended return, where, at line 2, box (c) of Form 4797, FRG indicated that the ABFS investment, which lost value because of the company's failure, had been "sold" on 11/30/2005. (Gov. Ex. 469 at 10, Doc. 225-21, PAGEID # 7200.)

she inherited her mother-in-law's estate.  (*Id.* ¶ 5.)  Other "fraud recovery" companies contacted her and offered their help working with the IRS, but informed her that they could not help after she told them that the investment in the Ponzi scheme had been her mother-in-law's and not her own.  (*Id.* ¶ 7, PAGEID # 8078.)  However, she was personally contacted by Elsass in 2008 via telephone, and, even after she explained to him that the investment was not her own, Elsass told her that FRG could get a tax refund from the IRS.  (*Id.* ¶¶ 8–10.)  She subsequently signed a contract with FRG, paid an up-front fee, and then, in mid-2008, worked with FRG to file an amended tax return.  (*Id.* ¶¶ 13–14.)  By August of 2009, her fee had been refunded but she did not learn why (because her theft-loss claim had been denied) until she became a witness in this lawsuit.  (*See id.* ¶¶ 16–21, PAGEID ## 8078–79.  *See also* Gov. Ex. 388, Doc. 223-21 (disallowance notice from the IRS regarding Heidell's amended returns); Gov. Ex. 384, Doc. 223-17.)

The instructions for preparing Heidell's amended return were given by Elsass/FRG. (Gov. Ex. 367, Doc. 223.)  Elsass also personally signed the amended tax return on behalf of FRG.  (Gov. Ex. 430, Doc. 224-21 (Heidell's amended 2005 tax return); Elsass Dep. 928, Gov. Ex. 486, Doc. 227-14, PAGEID # 7993.)  The record also contains evidence of at least one other instance where FRG attempted to claim a theft-loss deduction for a taxpayer arising from the investment loss of a deceased relative.  (*See* Gov. Ex. 66, Doc. 213-39 (May 24, 2010 letter from FRG attorney Laurie Wirt to Perry Furgala explaining why he could not claim his mother's ABFS investment loss).)  While Elsass seemed to suggest that the Heidell return should be considered a mistake made in the early days of his business, (see Elsass Dep. 929–31, Gov. Ex. 486, Doc. 227-14, PAGEID ## 7994–96), the Court notes that the letter to Pergola is dated almost two years after FRG's mid-2008 initial interactions with Heidell.

As with the improper use of Form 4797, the Court has little difficulty concluding Elsass and FRG acted at the very least with a reckless disregard for the tax laws by preparing claims for refunds arising from the investment losses of taxpayers' deceased relatives.  In this regard, Heidell's declaration that she was personally contacted by Elsass who proceeded to sign her amended tax return even after being told by Heidell that it was her deceased mother-in-law who had lost money in the Ponzi scheme is undisputed.  Telling in this instance is the fact that other tax companies contacted Heidell prior to FRG, but would not help her upon being informed of the nature of her situation.  While the Defendants deny that they intentionally filed the improper claim on behalf of Heidell, they cite nothing in the record to support this contention.  Accordingly, the Government has established that there is no material issue of fact as to whether Elsass and FRG served as tax return preparers on behalf of relatives of deceased investors, and that, in doing so, Elsass and FRG violated § 6694(b) as a matter of law.

**ii.**

Section 7407 of the I.R.C. also makes enjoinable any conduct that is subject to penalty under I.R.C. § 6695.  *See* 26 U.S.C. § 7407(b)(1)(A).  The Government asserts that Elsass and FRG have repeatedly run afoul of subsection 6695(f), which provides that

> Any person who is a tax return preparer who endorses or otherwise negotiates (directly or through an agent) any check made in respect of the taxes imposed by this title which is issued to a taxpayer (other than the tax return preparer) shall pay a penalty of $500 with respect to each such check. The preceding sentence shall not apply with respect to the deposit by a bank (within the meaning of section 581) of the full amount of the check in the taxpayer's account in such bank for the benefit of the taxpayer.

*Id.* § 6695(f).  In other words, pursuant to this subsection, a tax return preparer such as the Defendants cannot receive customer refund checks and deposit the funds therefrom into the tax return preparer's own bank account.

43

Despite this prohibition, the Government contends and the record establishes that Elsass and FRG employees negotiated some 510 refund checks between 2006 and 2011, with Elsass personally negotiating 203 checks. (Pond Decl. ¶ 21, Gov. Ex. 491, Doc. 228-4, PAGEID # 8094. *See also* Gov. Ex. 283A, Doc. 219-21.) FRG would cash or deposit the refund checks, deduct any deferred fee to which it was entitled, and then pay the customer the remaining balance. (*See* Elsass Dep. 457, Gov. Ex. 486, Doc. 227-2, PAGEID # 7696; Gov. Ex. 244, Doc. 218-22.)

The record contains various examples of the checks. (*See, e.g.,* Gov. Ex. 270, Doc. 219-7; Gov. Ex. 275, Doc. 219-12; Gov. Ex. 277, Doc. 219-14. *See also* Gov. Ex. 283, Doc. 219-20 (summary chart of checks negotiated by FRB employees).). The checks are indisputably for tax refunds and are directed to particular taxpayers, but are either stamped or endorsed to be paid to FRG instead in violation of § 6695(f). Finally, as noted by the Government, it appears that FRG and Elsass continued the practice of negotiating checks even after this lawsuit was filed.

The Defendants assert that having customers sign a combination of two power of attorney forms—Treasury Form 231 and IRS Form 2848—rendered FRG/Elsass' conduct in endorsing the checks permissible. They also note that the Government has since amended these forms to prohibit their combination in manner that would seem to allow endorsement of checks by tax return preparers. However, the Defendants fail to explain how the language of an administrative form could serve to override the will of Congress as expressed by § 6695(f). As such, the Court concludes that there is no issue of material fact as to whether the FRG and Elsass, while acting as tax return preparers, have negotiated refund checks issued by the IRS to FRG customers. The Court further concludes that, as a matter of law, that conduct violates § 6695(f) of the I.R.C.

**iii.**

Pursuant to § 7407, the Court may enjoin a tax return preparer if the Court finds that the preparer "misrepresented his eligibility to practice before the Internal Revenue Service, or otherwise misrepresented his experience or education as a tax return preparer."  26 U.S.C. § 7407(b)(1)(B).  The Government contends and the Court agrees that Elsass frequently misrepresented his eligibility to practice before the IRS by repeatedly signing Form 2848 (the IRS power of attorney form) indicating that he was an attorney in good standing in Ohio and through other conduct.

Part II of Form 2848 is titled "Declaration of Representative" and requires the representative to sign the form and indicate the capacity (e.g., attorney, CPA, Enrolled Agent, etc.) in which the representative serves the taxpayer.  It specifically requires the representative to declare, "[u]nder penalties of perjury," his or her respective capacity.  An attorney must represent that he or she is "a member in good standing of the bar of the highest court of the jurisdiction shown below."  Next to the box designated for the representative's signature is a box for the representative to state the appropriate jurisdiction.

Elsass admitted that his Ohio law license has been suspended indefinitely since 1998 and that he has never attempted to have it reinstated.  (Elsass Dep. 16, 54–55; Gov. Ex. 486, Doc. 226, PAGEID ## 7488, 7497–98.)  However, the record is undisputed that on at least 273 separate occasions between 2005 and 2010 he signed Form 2848 indicating that he was a licensed attorney, despite receiving warnings concerning his status as an attorney from the Treasury Department.  (Pond Decl. ¶¶ 11–15, Gov. Ex. 491, Doc. 228-4, PAGEID # 8093; Gov. Ex. 243, Doc. 218-19; Gov. Ex. 243A, Doc. 218-20.  *See also* Gov. Ex. 202, Doc. 217-19 (exemplar of Form 2848 signed by Elsass); Gov. Ex. 203, Doc. 217-20 (February 7, 2007 letter

from Treasury to Elsass concerning the status of his law license); Gov. Ex. 221, Doc. 217-38 (September 17, 2008 letter from Treasury to Elsass regarding his status as an attorney).) Aside from issues of perjury, such conduct undoubtedly constitutes a misrepresentation of Elsass' eligibility to practice before the IRS.

In the Court's view, other conduct of Elsass also constitutes violations of § 7407(b)(1(B). For instance, he would communicate with potential clients using language that would strongly imply that he was a licensed attorney. Government Exhibit 94, a June 2006 marketing letter from Elsass to Schneider investors provides an example of such conduct. His name in the signature block of the letter is followed by the initials "JD." (Gov. Ex. 94, Doc. 214-24, PAGEID # 5075.) Further, in the letter, while discussing the limited prospects for investment recoveries through litigation, he stated the following: "I hate to knock *my* profession, but the only winners in these cases are the lawyers." (*Id.*, PAGEID # 5074 (emphasis supplied).) According to Kinsel, she frequently observed Elsass telling customers that he was a practicing attorney. (Kinsel Decl. ¶ 22, Gov. Ex. 492, Doc. 228-5, PAGEID ## 8104–05.) Additionally, Elsass went as far as to insist that employees refrain from using his legal given name "Tobias" to make it more difficult for potential customers to discover that his law license had been suspended. (*Id.*)

### iv.

The Government also contends that FRG and Elsass' conduct violated (and continues to violate) § 7407(b)(1)(D), which allows the Court to enjoin tax return preparers "engaged in any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue laws." 26 U.S.C. § 7407(b)(1)(D). According to the Government, Defendants have run afoul of this provision by 1) misleading customers into

believing that the IRS had approved faulty rationale with regard to theft-loss deductions while ignoring IRS disallowances; and 2) charging exorbitant contingent fees.  As an initial matter, the Court is unconvinced by the Government's position regarding the contingent fees as it is not clear how such fees standing alone could be considered fraudulent or deceptive.  For instance, there is nothing in the record to indicate that FRG or Elsass have ever misled customers about the nature of the fees they charge.

The Court, however, agrees with the Government that Elsass and FRG have committed deceptive acts that substantially interfere with the administration of the tax laws by misleading customers in various ways.  As an example, the Court looks to a March 5, 2008 promotional letter to prospective Schneider customers wherein Elsass stated:

> All requests for a tax refund regarding losses for the Schneider investment must be postmarked on or before April 15, 2008.
>
> The case law regarding 165(C)(2) [sic] tax refunds for a victim of investment fraud is clear, you must take your investment loss in the year the loss is discovered.  Schneider's year of discovery is clearly 2004.  All previous refunds we obtained for Investors have used the year 2004 as the year the loss was discovered.  Consequently, your right to a refund will expire midnight April 15, 2008.

(Gov. Ex. 113, Doc. 215-2.)   This statement is deceptive as it fails to mention the legal requirements concerning prospects for recovery and ignores the fact the IRS had already begun to disallow Schneider theft losses using 2004 as the year of discovery.  (*See* Gov. Ex. 109 at 4, Doc. 214-39, PAGEID # 5141 (November 2007 notice of disallowance of Schneider theft-loss claim of Richard Pavlich on the grounds that taxpayer could not establish that no reasonable prospect for recovery existed in 2004).)  Further, as the letter was no doubt intended to persuade Schneider investors to file theft-loss claims—claims that were untimely at that point in time and thus improper—the Court also concludes that the statements substantially interfere with the

administration of the tax laws as they attempt to goad taxpayers into claiming improper deductions.

## 2.

In addition to § 7407, the Government also urges the Court to enjoin the operations of the Defendants under § 7408 of the I.R.C. Pursuant to § 7408, if the Court determines that the Defendants have engaged in certain specified conduct and "that injunctive relief is appropriate to prevent recurrence of such conduct," the Court "may enjoin [the Defendants] from engaging in such conduct or in any other activity subject to penalty under [the I.R.C.]." 26 U.S.C. § 7408(b). While § 7407 applies only to tax return preparers, § 7408 applies broadly to any person, a term that includes corporations and entities. *See id.* § 7701(a)(1).

The Government contends that the Defendants have engaged in several types of conduct made enjoinable by § 7408 including conduct subject to penalty under I.R.C. §§ 6700 and 6701 (made enjoinable by § 7408(c)(1)) and conduct in violation of the regulations issued pursuant to 31 U.S.C. § 330 (made enjoinable by § 7408(c)(2)).

## a.

I.R.C. § 6700 pertains to the promotion of abusive tax shelters and subjects to penalty any person who makes false or fraudulent statements regarding the tax benefits of such a tax-avoidance scheme. *See* 26 U.S.C. § 6700(a). "Under § 6700 any 'plan or arrangement' having some connection to taxes can serve as a 'tax shelter' and will be an 'abusive' tax shelter if the defendant makes the requisite false or fraudulent statements concerning the tax benefits of participation." *United States v. Raymond*, 228 F.3d 804, 811 (7th Cir. 2000). A person is subject to penalty under § 6700 when the following elements are present:

(1) he organized or participated in the sale of an entity, plan, or arrangement, (2) he made false or fraudulent statements regarding specified tax matters, including

deductions, in connection with that organization or sale, (3) he knew or had reason to know that his statements were false or fraudulent, and (4) the statements pertained to a material matter.

*United States v. Gleason*, 432 F.3d 678, 682 (6th Cir. 2005). Here, the Defendants do not dispute the materiality element. (Defs.' Mem. Supp. Mot. Summ. J. 31 n.5, Doc. 230, PAGEID # 8268.) Further, the Court also finds that FRG's business model can be considered the "sale of a plan" or the "sale of an arrangement" as it is closely connected with aiding customers in obtaining tax refunds arising from theft-loss deductions, and FRG's fees are contingent on successfully obtaining refunds.

Turning to whether FRG and Elsass have made false or fraudulent statements, § 6700 covers both statements related to "'the availability of tax benefits'" and "those 'concerning factual matters that are relevant to the availability of tax benefits.'" *United States v. Stover*, 650 F.3d 1099, 1108 (8th Cir. 2011) (quoting *United States v. Campbell*, 897 F.2d 1317, 1320 (5th Cir. 1990)). The Government contends that Elsass and FRG made various false statements to customers and prospective customers concerning eligibility for valid theft-loss deductions. While the Defendants argue that the Government has failed to produce evidence of such false statements, a review of the record indicates otherwise. The Court lists the following, non-exhaustive examples of false statements made by Elsass or FRG, keeping in mind that statements can be false based on what they fail to convey. *See Stover*, 650 F.3d at 1109:

- In an October 1, 2006 email to an attorney representing Schneider investors, Elsass stated that "To take a 165(C)(2) [sic] loss it must be supported with expert testimony…." (Gov. Ex. 82 at 2, Doc. 214-13, PAGEID # 5056.) To the contrary, the legal elements of a proper theft-loss include no such requirement. *See* Part III.B.1.b.i, *supra*.

- In a February 2006 email exchange with a potential Schneider customer, Elsass falsely

told the taxpayer that it was acceptable to proceed with the IRS even though it was not

yet clear what recovery the Schneider investors might realize through the efforts of the

receiver.  The taxpayer specifically raised concerns about getting a tax refund without

"knowing how much we will get back from the receiver," and Elsass replied,

> As to your questions number 1) about going ahead, the IRS does not
> require this to be over to proceed.  We are required to make a reasonable
> investigation into proceedings and possible recovery.  I have done this
> already…. I cannot tell you lots of details of why but I have been told to
> use $0 as the expected recovery.  It should be pretty obvious to everyone
> that NO ONE except maybe the banks are going to get 100% of their
> money back.  If I get you $10,000 and eventually every thing [sic] turns
> out better than expected and you get $10k to 20k from Receiver, you still
> are out most of your money.

(Gov. Ex. 85 at 1, 2, Doc. 214-16, PAGEID ## 5061–62.)  These statements are false

regarding the availability of the theft-loss deduction in at least two ways.  First, they

suggest that only an investigation into recovery is necessary.  Second, they indicate that

the prospective customer's entire loss can be deducted even though there remained a

prospect for at least some recovery.

- Statements in the March 5, 2008 promotional letter discussed *supra* in Part III.B.1.b.iv
  for the reasons stated there.

- As previously noted, Elsass personally informed Deborah Heidell that FRG could get her
  a tax refund, even upon being informed that the investment in question had belonged to
  Heidell's deceased mother-in-law.  (Heidell Decl. ¶¶ 9–10, Gov. Ex. 489, Doc. 228-2,
  PAGEID # 8078.)

- In a promotional letter to investors who had lost money in a company called Pay By
  Touch, FRG denigrated the ability of ordinary CPAs to prepare theft-loss claims.  The
  letter gives several false reasons why "your CPA **cannot** and **should not** process a 165

refund," including that "[a] ***Review*** must be made of over 95 years of legal opinions and IRS rulings that proves the six elements are present to perform a 165(c)(2);" "[a] ***165(c)(2) Attorney Letter*** is required for approval of the refund, which CPA's do not have the training to prepare an expert legal opinion;" and that "[a] ***Theft Loss Opinion Letter*** is required."  (Gov. Ex. 351 at 1, Doc. 222-5, PAGEID # 6481 (emphasis in original).)  The statement that CPAs "cannot" prepare a theft-loss deduction is an outright lie.  Further, there are no formal requirements for reviewing every case ever decided on theft losses, nor for an "Attorney Letter," or a "Theft Loss Opinion."

Finally, the Court also concludes that the record is undisputed that Elsass/FRG knew or had reason to know that the statements identified above (and other similar statements) are false. Factors relevant to this inquiry include: "'(1) the extent of the defendant's reliance upon knowledgeable professionals; (2) the defendant's level of sophistication and education; and (3) the defendant's familiarity with tax matters.'"  *Gleason*, 432 F.3d at 683 (quoting *United States v. Estate Preservation Servs.*, 202 F.3d 1093, 1103 (9th Cir. 2000)).  A review of these factors supports the Court's conclusion.

First, the record indicates that Elsass and FRG did not rely on outside advice in preparing theft-loss refund claims and went as far as to suggest that CPAs lacked the ability to do so. Rather, Elsass personally provided the direction as to how customers' amended tax returns should be prepared.  (*See* Kinsel Decl. ¶ 9, Gov. Ex. 492, Doc. 228-5, PAGEID # 8099.)  As to the second and third factors, Elsass can personally be considered a sophisticated individual, having obtained an undergraduate and professional degree.  Additionally, he possesses significant experience with theft-loss deductions and has held himself out to the public as an expert in that area of tax law.  He is aware of the legal requirements for a proper § 165 theft-loss

deduction.

Further, other FRG employees (and the entity as a whole) can be considered similarly sophisticated and experienced.  One promotional letter stated that: "FRG has likened the whole 165 refund process to brain surgery.  You have chosen to have this 'surgery' performed by one of the country's leading authorities on 165 claims."  (Gov. Ex. 356 at 3, Doc. 222-10, PAGEID # 6500.)  Relatedly, in a January 2009 promotional letter, Elsass boasted of qualifications of FRG's staff, a staff purported to include "a litany of tax professional's [sic]," attorneys, and former IRS agents.  (Gov. Ex. 371 at 1, Doc. 223-4, PAGEID # 6549.)  Elsass also provided training to the staff.  (*See* United States' Statement of Contested and Uncontested Facts, ¶ 21, Doc. 229-1, PAGEID # 8195.)

Accordingly, for the above-stated reasons, the Court concludes that the Government is entitled to summary judgment on the issue of whether Elsass and FRG have violated § 6700 by promoting an abusive tax shelter.

### b.

Section 6701 establishes penalties for aiding and abetting the understatement of tax liability.  Pursuant to that section:

Any person—

> (1) who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, affidavit, claim, or other document,

> (2) who knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws, and

> (3) who knows that such portion (if so used) would result in an understatement of the liability for tax of another person,

shall pay a penalty with respect to each such document in the amount determined

under subsection (b).

26 U.S.C. § 6701(a).

For reasons largely stated previously in this opinion, the Court concludes that the Government is entitled to summary judgment as to the issue of whether the Defendants[6] violated § 6701 by assisting customers in filing amended tax returns containing improper theft-loss deductions.  It is undisputed that their business involves aiding, assisting, or advising taxpayers respecting the preparation of the portion of tax returns dealing with such deductions.  Further, claiming substantial refunds arising from theft losses by amending prior year returns touches upon material matters regarding the customers' tax positions as the customers' tax liability is directly affected by claiming the deductions at issue in this case.   As the Defendants filed amended returns on behalf of their customers and as their business relies on a contingent fee deducted from realized tax refunds, they clearly were aware that their advice and assistance would be used in connection with the material matters.  Finally, given Elsass and his staff's knowledge of the basic requirements of § 165 theft-loss deductions, and the fact that they have held themselves out to the public as experts on such deductions, the Court concludes that they knew that the improper theft loss deductions they prepared would understate the tax liability of their customers.

**c.**

Section 7408 also makes enjoinable conduct "in violation of any requirement under regulations issued under section 330 of title 31, United States Code."  26 U.S.C. § 7408(c)(2). Section 330 gives the Secretary of the Treasury authority to regulate the practice of

---

[6] The Court concludes that STS also aided and abetted the understatement of tax liability by serving as the tax return preparer for amended returns claiming ABFS and OneCap theft losses. (*See* Gov. Ex. 75, Doc. 214-6 (ABFS); Gov. Ex. 151, Doc. 216 (OneCap); Gov. Ex. 153, Doc. 216-2 (OneCap).)

representatives before the Treasury Department (including the IRS), which the Secretary has done through regulations codified at 31 C.R.F., Part 10.  The regulations are also published in a document known as Circular 230.  Here, the Government contends that Elsass violated Circular 230 by practicing before the IRS with a suspended law license.

Pursuant to the regulations[7], a "practitioner" before the IRS may be sanctioned if he or she is "shown to be incompetent or disreputable."  *See* 31 C.F.R. § 10.50(a) (2010).  The term practitioner is defined to include specifically listed types of individuals including attorneys, who may generally "practice before the Internal Revenue Service" if certain administrative requirements are satisfied.  *See id.* §§ 10.2(a)(5), 10.3(a).  The term "[p]ractice before the Internal Revenue Service":

> comprehends all matters connected with a presentation to the Internal Revenue Service or any of its officers or employees relating to a taxpayer's rights, privileges, or liabilities under laws or regulations administered by the Internal Revenue Service. Such presentations include, but are not limited to, preparing and filing documents, corresponding and communicating with the Internal Revenue Service, rendering written advice with respect to any entity, transaction, plan or arrangement, or other plan or arrangement having a potential for tax avoidance or evasion, and representing a client at conferences, hearings and meetings.

*Id.* § 10.2(a)(4).  Finally, the regulations list certain forms of conduct that are considered "incompetent or disreputable" and are thus subject to sanction.  Such conduct includes, but is not limited to, "[d]isbarment or suspension from practice as an attorney."  *Id.* § 10.51(a)(10).

In the instant case, there is no material issue of fact that Elsass was an attorney-practitioner before the IRS on the grounds that actions he took on behalf of FRG customers amount to "practice before the Internal Revenue Service."  In this regard, the record is undisputed that Elsass personally signed amended tax returns on behalf of customers, was

---

[7] As certain sections of 31 C.F.R. pt. 10 have been amended since the Government filed this action, the Court will refer to the regulations as they existed in 2010.

granted powers of attorney from customers through signing Form 2848, and communicated with the IRS on behalf of customers during appeals.  (*See* Gov. Ex. 40 at 1–2, Doc. 213-14, PAGEID ## 4684–85 (February 16, 2009 letter from Elsass and Kinsel to David Zito); & *supra* Parts III.B.1.a (discussing tax returns signed personally by Elsass) III.B.1.b.iii (discussing Form 2848 issues).)  Further, the record is undisputed that during FRG's entire existence, Elsass' law license has been suspended.  Finally, the Court notes that Revenue Procedure 81-38 makes clear that a suspended attorney may not serve as an unenrolled tax return preparer, a status sometimes claimed by Elsass on Form 2848.  *See* Rev. Proc. 81-38 § 9.01(b), 1981-35 I.R.B.  (*See also* Gov. Ex. 228 at 2, Doc. 218-4, PAGEID # 6111 (Form 2848 signed by Elsass as an unenrolled preparer).)  Accordingly, Elsass has violated Circular 230's requirements by engaging in incompetent or disreputable behavior, and his conduct in doing so is subject to injunction under § 7408.

## C.

Having determined that the Defendants have committed multiple violations of various provisions of the I.R.C. subject to injunction under §§ 7407 and 7408, the Court now considers the appropriate relief.  The Government argues that the record establishes a pattern of ongoing and egregious conduct and seeks, inter alia, an order preventing the Defendants from working as tax return preparers.  The Court agrees with the Government that broad relief against the Defendants is required to prevent them from interfering with the proper administration of the Nation's income tax system and accordingly issues permanent injunctive relief concurrently with this opinion and order.  Below, the Court will first briefly summarize its authority in awarding this relief.  Next, the Court will discuss its findings regarding the appropriateness of the relief ordered.

**1.**

Pursuant to § 7407, the Court may enjoin specified conduct if the Court finds that a tax return preparer has engaged in that conduct and "that injunctive relief is appropriate to prevent the recurrence of such conduct."  26 U.S.C. § 7407(b).  Further:

> [i]f the court finds that a tax return preparer has continually or repeatedly engaged in [the specified conduct] and that an injunction prohibiting such conduct would not be sufficient to prevent such person's interference with the proper administration of this title, the court may enjoin such person from acting as a tax return preparer.

*Id.*  Under § 7408, if the Court determines that a person has engaged in the conduct specified therein and that injunctive relief is appropriate to prevent recurrence of such conduct, "the court may enjoin such person from engaging in such conduct or in any other activity subject to penalty under this title."  *Id.* § 7408(b).  In determining the need for an injunction to prevent future recurrence of violations, a court should consider several factors, including, but not limited to:

> (1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation; (3) the defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the defendant's recognition (or non-recognition) of his own culpability; and (6) the likelihood that defendant's occupation would place him in a position where future violations could be anticipated.

*United States v. Gleason,* 432 F.3d 678, 683 (6th Cir. 2005) *(*quoting *United States v. Estate Preservation Servs.*, 202 F.3d 1093, 1105 (9th Cir. 2000)).

In addition to its powers under §§ 7407 and 7408, the Court possesses broad authority to ensure effective operation of the tax laws pursuant to § 7402 of the I.R.C., which provides in part that:

> The district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction, and of *ne exeat republica*, orders appointing receivers, and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws. The remedies hereby provided are in addition to and not exclusive of any and all other

remedies of the United States in such courts or otherwise to enforce such laws.

26 U.S.C. § 7402(a).  The language of § 7402(a) "manifest[s] a congressional intention to provide the district courts with a full arsenal of powers to compel compliance with the internal revenue laws." *Brody v. United States*, 243 F.2d 378, 384 (1st Cir. 1957).  Further, § 7402(a) "has been used to enjoin interference with tax enforcement even when such interference does not violate any particular tax statute." *United States v. Ernst & Whinney*, 735 F.2d 1296, 1300 (11th Cir. 1984).

Finally, the Court notes that because each of the I.R.C. sections discussed above expressly authorize the issuance of injunctions, "the traditional requirements for equitable relief need not be satisfied." *Gleason*, 432 F.3d at 682.  *See also United States v. Stover*, 650 F.3d 1099, 1106 (8th Cir. 2011) ("When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose." (quotation and citation omitted)).

**2.**

As prerequisites to relief under §§ 7407 and 7408, the Court has previously concluded that the Defendants have repeatedly engaged in the penalizable conduct specified in those sections.  This conduct includes: 1) willfully and/or recklessly understating the tax liability of hundreds of FRG customers in violation of § 6694; 2) negotiating hundreds of customer refund checks in violation § 6695(f); 3) over 250 individual violations by Elsass of § 7407(b)(1)(B); 4) deceptive practices in violation § 7407(b)(1)(D); 5) promoting an abusive tax shelter in violation of § 6700; 6) aiding and abetting the understatement of tax liability in violation of § 6701; and 7) Elsass' numerous personal violations of the Treasury Department's regulations governing

representation of clients before the IRS.

The Court also concludes that injunctive relief is necessary to prevent the recurrence of the conduct identified above. Considering the appropriate factors, the Court first notes the substantial harm caused by the Defendants' conduct. The record indicates the Defendants have filed millions of dollars worth of theft-loss deductions with the IRS, a vast majority of which the IRS estimates to have been improper. (*See* Poole Decl. ¶¶ 11, 12, Gov. Ex. 494, Doc. 228-7, PAGEID # 8113–14.) In addition to the financial harm to the Government, the Defendants have also caused harm to their customers. As Elsass noted, a large portion are elderly and all have recently lost substantial sums of money to bad investments or through actual fraud. However, despite the Defendants' contention that they provide a valuable service to the public, Elsass and FRG are doing these individuals no favors by leading them to believe that they have valid and/or timely theft-loss deductions to claim and in sometimes taking thousands of dollars in advance fees from them only for the customers' claims to be denied by the IRS and for the customers to potentially be subjected to audits and scrutiny from the IRS.

Regarding the Defendants' participation and degree of scienter, it is evident that violations of the I.R.C. described in this opinion are the direct result of intentional actions taken by Elsass and FRG in the course of operating their business. Further, the record also demonstrates that the conduct described herein is in no way isolated, but is instead recurrent in nature, involving hundreds of individual customers, their tax returns, and millions of dollars. Relatedly, because Elsass and FRG's business centers on theft-loss deductions, it is highly likely that if they were allowed to continue operating, their customary business activities would again lead them to run afoul of the tax laws. In the Court's view, FRG's use of contingent fees only amplifies this risk, as it creates an incentive to aggressively pursue theft-loss claims regardless of

the claims' underlying merits.

The next factors to consider are the Defendants' recognition of their own culpability and the sincerity of their assurances against future violations. While the Defendants, and Elsass personally, have recognized that "mistakes were made in the past," and claim to have remediated past practices, the record, and Elsass' past conduct suggest to the Court that such assurances must be taken with great skepticism. To be blunt, Elsass seems perfectly willing to lie and deceive, even to the extent of possibly committing perjury, in order to advance his own interests. In this regard, he was suspended from the practice of law in part because of "repeated acts of dishonesty, deceit, and failure to abide by [the Supreme Court of Ohio]'s orders." *Columbus Bar Ass'n v. Elsass*, 713 N.E.2d 421, 425 (Ohio 1999). Further, aside from the deceptive conduct identified in this opinion—repeatedly signing Form 2848 falsely indicating that his law license was in good standing and making false and deceptive statements to potential FRG customers— other materials in the record indicate a tendency on Elsass' part to deceive. For instance, Government Exhibit 221 is a September 17, 2008 letter from Theresa J. Oleshytsky to Elsass regarding Elsass' status as an attorney. In the letter, Oleshytsky states that "[i]n our conversation on September 11, 2008, you advised that your Counsel is working on getting your attorney license with the State of Ohio reinstated. You made this same claim previously as well." (Gov. Ex. 221 at 1, Doc. 217-38, PAGEID # 6099.) However, during his deposition, Elsass specifically testified that he has never made any effort to have his law license reinstated. (*See* Elsass Dep. 55; Gov. Ex. 486, Doc. 226, PAGEID # 7498 ("I've never looked into [getting law license reinstated].").)

The sincerity of the Defendants' remediation efforts is also called into question by the fact that, in many instances, they continued prohibited conduct even after being warned by the

IRS or after this lawsuit was filed. This conduct includes Elsass' signing of Form 2848, improperly negotiating customer refund checks, and continuing to maintain positions regarding theft-loss claims even after those positions were called into question or rejected by the IRS. Accordingly, a balancing of the factors identified in *Gleason* weighs heavily in favor of injunctive relief to prevent the recurrence of the Defendants' violations.

Additionally, the Court looks to its extended authority under § 7407 and concludes that an injunction merely prohibiting Elsass and FRG from engaging in the specified conduct will be insufficient to prevent them from interfering with the proper administration of the I.R.C. Taken individually, each of the Defendants transgressions identified in this opinion could potentially be viewed as the Defendants purport them to be: honest mistakes made during the ascent of a steep learning curve. However, taken together and considering their repeated nature, there can be no doubt that the collective transgressions represent concerted and conscious attempts to game the Nation's income tax system not necessarily for the benefit of FRG's customers, but for the profit of Elsass himself.

Absent a broad injunction, a review of the record leads to the conclusion that Elsass and FRG will likely find new ways to manipulate the system to their advantage. This conclusion is supported by the fact that, when confronted with their conduct and warned, Elsass and FRG have in many instances carried on as if indifferent to the repercussions of doing so. The conclusion is also supported by the fact that they have been willing to lie and stretch the bounds of the law's requirements and of logic in pursuit of unsupportable deductions, as with the improper use of Form 4797. The conclusion is further supported by the sheer magnitude and variety of the Defendants' transgressions. Therefore, the Court determines that narrow injunctive relief is insufficient to stop their interference with the tax code and will permanently enjoin Elsass and

FRG from serving as tax return prepares as that term is defined by I.R.C. § 7701(a)(36)(A).

Finally, the broad injunctive relief issued concurrently herewith is supported by Court's substantial authority under § 7402(a). In this regard, even if the Defendants' business structure somehow left them outside the legal definition of tax return preparers, broad relief would still be appropriate, as § 7402(a) is undoubtedly designed to prevent individuals from undermining the Nation's tax laws through exploiting loopholes in the I.R.C.'s overall regulatory scheme. *See Ernst & Whinney*, 735 F.2d at 1300.

IV.

For the above-stated reasons, the Parties' cross-motions for summary judgment (Docs. 212 & 230) are **GRANTED in PART and DENIED in PART,** and the Defendants' Motion to Strike Certain Government Summary Judgment Exhibits (Doc. 236) is **DISMISSED**. The Court concurrently issues permanent injunctive relief against the Defendants and the Clerk is directed to close this matter.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT JUDGE